2023 IL App (1st) 1220966-U

SIXTH DIVISION
July 21, 2023

No. 1-22-0966

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 06 CR 14275 |
| | ) | |
| BENJAMIN JOHNSON, | ) | Honorable |
| | ) | Carol M. Howard, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Oden Johnson and Tailor concurred in the judgment.

**O R D E R**

¶ 1    *Held*: The trial court's rejection of defendant's insanity defense was not against the manifest weight of the evidence where the court relied on lay witness testimony from the complainant describing conduct by the defendant which suggested planning and deliberate attempts to evade detection and where defendant's own expert witness was not prepared to say that he was insane at the time of the offense.

¶ 2    Following a bench trial, defendant Benjamin Johnson was found guilty of aggravated criminal sexual assault, kidnapping, and robbery and sentenced to a total of 36 years in prison. On appeal, Mr. Johnson argues that his convictions should be reversed because he was legally insane at the time of the offenses and that it was against the manifest weight of the evidence for the trial

court to find otherwise. For the reasons set forth in this order, we affirm.

¶ 3                               I. BACKGROUND

¶ 4      On June 28, 2006, defendant Benjamin Johnson was indicted by a grand jury for aggravated criminal sexual assault, criminal sexual assault, aggravated kidnapping, kidnapping, unlawful restraint, and robbery. The charges stemmed from an incident on March 28, 2006, involving a single victim, E.M.

¶ 5      At trial, Mr. Johnson raised the affirmative defense of insanity. Section 6-2 of the Criminal Code of 2012 (Code), which codifies the insanity defense, provides that "[a] person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct." 720 ILCS 5/6-2(a) (West 2006). It is a defendant's burden to prove by clear and convincing evidence that he is not guilty by reason of insanity. *Id.* § 6-2(e).

¶ 6                             A. The State's Case

¶ 7      At Mr. Johnson's bench trial, E.M. testified that at approximately 1 a.m. on March 28, 2006, she was returning to her home after visiting her friend Erik Sanchez who lived nearby. Upon entering the lobby of her building, located at 620 West Addison Street in Chicago, she walked past the mailboxes and began to head up the stairs when she noticed that the light in the stairwell was out. As she climbed the first few steps, she noticed a silhouette. She tried to run up the stairwell but was grabbed, pushed against the stairs, and punched repeatedly in the face. E.M. testified that she tried to fight back with her fists, but her attacker pulled her under the stairs, flipped her onto her stomach, told her to shut up, and tied her hands behind her back with shoelaces he took from her shoes. The attacker, whom she could now see was a man, then led her forcefully from behind through the building's laundry room into "some sort of mechanical room." Once there, the man

took off her clothes and repeatedly inserted his finger into her vagina and anus. She testified that the man then asked her if she wanted a condom and she said that she did. The man then inserted his penis into her vagina and anus multiple times as E.M. cried. On cross-examination, E.M. further testified that the man eventually ejaculated and that he told her the condom broke.

¶ 8 E.M. testified that when the man finished penetrating her, he lit a cigarette and told her that "it could have been worse." The man then went through E.M.'s wallet, took out $140 and her transit pass and, after seeing her driver's license, asked her what her nationality was. He told her that he wished they could have met on different terms, and he began to wipe down all the items he had touched with E.M.'s shirt. The man then told her to count to 40, and he fled out the door they had come in through.

¶ 9 E.M. turned on her phone and called her friend Erik to tell him she had been attacked. Erik arrived in less than an hour and took her to Illinois Masonic Medical Center where a nurse administered a rape kit. E.M. recalled that she had a bloody nose, a split lip, and "[b]ruises and lesions in [her] head." She also recalled injuries to her anus and vagina and stated that she had been a virgin prior to the attack. She testified that she spoke with police officers that day at the hospital and mentioned the items that the man had taken from her purse. She further testified that on June 8, 2006, she went to the police station to view a lineup, but she did not identify any of the participants as the man who attacked her.

¶ 10 The State also called Erik Sanchez, E.M.'s friend, as a witness. Mr. Sanchez testified that he had known E.M. for over a decade and that in the hours before she was attacked, E.M. had gone out to dinner with him and his sister. After dinner, the three of them returned to his house, which was about a 10-minute drive from where E.M. lived. He testified that they "called it a night" around midnight, and E.M. and his sister left his apartment. He testified that shortly thereafter, between

3

one and two in the morning, he received an unexpected phone call from E.M. who was "very distraught." E.M. told him that she had been attacked and that she needed him to take her to the hospital. Mr. Sanchez testified that he and his roommate immediately went to pick up E.M. He recalled that when she got in the car, "[s]he had her arms crossed and head down and she immediately went to the backseat and plopped herself down and was crying and had her head down the whole time." He sat with her in the backseat on the way to the hospital to try to comfort her.

¶ 11    The State next called Jaclyn Jackson, the emergency room nurse at Illinois Masonic who examined E.M. on the morning of her attack and administered a sexual assault kit. Ms. Jackson was accepted as an expert in the field of sexual assault examination. The State asked a series of questions about her examination of E.M. and the general process for examining someone who reports a sexual assault. Ms. Jackson testified that E.M. had presented with external pain or injuries to seven areas of her body, including a rectal tear.

¶ 12    The parties stipulated to an unbroken chain of custody for the physical evidence. They further stipulated that semen samples collected from the vaginal and rectal swabs in E.M.'s assault kit were analyzed by various experts in the field of forensic biology and DNA analysis, and the semen generated a DNA profile which matched a DNA sample taken from Mr. Johnson.

¶ 13    In addition to the witnesses described above, the State also called S.S., who testified to her own experience being violently sexually assaulted on May 10, 2006, about six weeks after E.M.'s assault. Mr. Johnson was also the defendant in S.S.'s case (case No. 06 CR 11543). She was permitted to testify at E.M.'s trial as other crimes evidence pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3(a)(1) (West 2006)).

¶ 14    The court allowed, and Mr. Johnson's counsel agreed to, the use of S.S.'s testimony in E.M.'s trial as evidence of *modus operandi* and to show Mr. Johnson's propensity to commit sex

crimes. However, the court stated that it would not consider S.S.'s testimony when determining if Mr. Johnson was sane at the time he assaulted E.M. The court explained that while S.S.'s testimony was certainly relevant to the issue of Mr. Johnson's sanity during that particular assault, it was not relevant to whether he was sane when he assaulted E.M., as "on the narrow issue of sanity, since by the very nature, sanity is something that changes from day to day and hour to hour, I'm not sure how it's probative of the issue of sanity at the time of the assault on E.M."

¶ 15    S.S. testified that on May 10, 2006, at around 3 a.m., she was asleep in her bedroom when she heard a "big crash, a big boom." She had moved into her apartment, located at 4144 North Sheridan Road in Chicago ten days earlier. Upon hearing the startling noise, she became wide awake, "popped out of bed," and ran into the next room, "right into a strange man," whom she identified in court as Mr. Johnson.

¶ 16    S.S. testified that Mr. Johnson pushed her back into the bedroom, threw her onto her bed, and got on top of her. It "all happened very very quickly." She testified that within seconds of getting her onto the bed, Mr. Johnson began pounding her head "over and over again" with either his fist or some object. She recalled being struck some 40 or 50 times. As Mr. Johnson beat her, S.S. recalled him telling her "shut up you b****, be quiet, shut up, why are you trying to fight back. Don't you think I've done this before. You're stupid to try to fight back." S.S. tried to scream but said, "[e]ventually I couldn't scream any more." She testified that Mr. Johnson was shoving her face into the bedsheets and she struggled to breathe, eventually blacking out.

¶ 17    When she came to, Mr. Johnson was tearing her sheets into strips to tie her wrists together behind her back. He then left to go to the bathroom. S.S. recalled hearing him urinating, at which point she attempted to escape. She loosened her hands free from the binding and ran towards the front door, but it was locked, and she did not have time to open it before she was intercepted by

Mr. Johnson, who pulled her off the doorknob, dragged her back to the bedroom, and proceeded to beat her again. After punching her several more times in the head, he tied her wrists and her ankles. S.S. testified that he then maneuvered her to the bathroom and sat her on the toilet.

¶ 18     In the bathroom, S.S. saw for the first time how Mr. Johnson had broken into her apartment. She observed a hole in the bathroom ceiling where he must have "fell through or broke through." S.S. testified that Mr. Johnson then unzipped his pants, slapped her across the face with his erect penis, and tried "to force himself into [her] mouth." S.S. clenched her mouth shut. Mr. Johnson then brought her back to the bedroom and positioned her face down on the bed and tried to penetrate her from behind, but S.S. clenched her legs together and begged him not to rape her. Mr. Johnson responded, "I'm not raping you b****, I'm f****** you." He then rolled her onto her back, got on top of her, and penetrated her vaginally until he ejaculated. S.S. testified that Mr. Johnson then made her lay there for a while before he got up and started rummaging through her things.

¶ 19     Mr. Johnson asked S.S. where her purse was. He then went through her things, telling S.S. that if she said anything without him asking her to, he would hit her again. Mr. Johnson then blindfolded S.S. with a sleeping mask and told her that they were leaving. He started packing her things into luggage and took her into the bathroom to clean her up. Mr. Johnson turned on the water and said, "look what you made me do to you, you're a [mess], you better listen to me, you have to listen to me now." He then walked her to the closet and told her to put on some clothes. S.S. recalled feeling a sharp object, "like a knife," at her neck. Mr. Johnson then told S.S., "you're a religious girl, do you believe in religion, if you are religious, you say a prayer now, this is it, you're going to die now." S.S. recited a Hail Mary.

¶ 20     Once S.S. put on some clothes, Mr. Johnson took her back to the kitchen, leaned her against

the stove, and put his hands down her pants. As he penetrated her vaginally with one hand and touched her breast with the other, he told S.S. "how much [she] liked him doing this." He then turned on the stove, held her hand above the fire, and threatened to burn her. The two of them then walked towards the apartment's front door with a wheeled suitcase that Mr. Johnson had packed with some of S.S.'s items, including her Blackberry and laptop.

¶ 21     As they exited the apartment, Mr. Johnson told S.S., "we are going to walk like a couple." Mr. Johnson then walked S.S. to a nearby cash station and told her to take out as much money as she could. She took out $200 and gave it to him. The State then asked a few questions about S.S.'s injuries and S.S. explained that she suffered "[t]errible head injuries" from Mr. Johnson's beatings, including an orbital fracture to her eye, and that her head was "bruised throughout, cut and bleeding throughout." The State asked no further questions and the parties stipulated to defense counsel's previous cross-examination of S.S. in case No. 06 CR 11543.

¶ 22                                    B. The Defense's Case

¶ 23     Mr. Johnson proceeded by way of stipulation, introducing testimony from several individuals who had testified in case No. 06 CR 11543. These witnesses included Nicole Johnson, Nicole Smith, Dr. Linda Grossman, and himself.

¶ 24     Nicole Johnson, Mr. Johnson's second cousin, testified that she had known him her whole life. She recalled that as a child, "we were always told we couldn't be around him" because he would talk to himself and "was just different than my other cousins." She lost contact with Mr. Johnson over the years but reconnected with him in 2005 or 2006 when he came to live with her after being released from prison. She testified that when Mr. Johnson first came to live with her, "everything was routine." He would go to church with her and her mother and he would help out in the neighborhood. After about six or seven months, however, he stopped going to church, and

started "hanging out at more parties."

¶ 25    According to Ms. Johnson, Mr. Johnson began to consume alcohol and marijuana and to free base cocaine with increasing frequency. She started to notice changes in his behavior. She recalled one incident where Mr. Johnson and her daughter, who at the time was 18, got into a physical altercation. Her daughter hit him and threw objects at him, and Mr. Johnson pinned her down. He did not hit her back, but Ms. Johnson "could see in his eyes and anger in his face that he wanted to hurt her. And that's when I knew that I needed to try to seek help for him."

¶ 26    Ms. Johnson further testified that Mr. Johnson would pace about with the lights on, talk to himself, and tell her about hearing voices in his head that would "tell him bad things." His behavior became so erratic and concerning that she tried to get him help. In May 2006, she took him to a social security office. She recalled that at the office "[h]e was acting very irrational, even worse than I had ever seen," pacing and hitting the walls and talking to himself, behavior that an intake worker witnessed. Ms. Johnson was able to get her cousin an appointment for an evaluation, but he was arrested before he could go.

¶ 27    Ms. Johnson further testified that Mr. Johnson would complain of frequent headaches and that she would often observe him crying. Once he started using drugs more often, his personal hygiene also became worse. He would wear the same clothes every day, had stopped grooming himself, and one time went at least a week without bathing.

¶ 28    Mr. Johnson also testified on his own behalf in case No. 06 CR 11543. He explained that he was born in Mississippi but moved to Chicago at an early age. He described himself as an alcoholic and testified that he began drinking alcohol and smoking cigarettes as a young child. He further testified that he struggled a lot in school because he was hyper and suffered from a speech impediment, for which he was ostracized. He completed some high school but was "kicked out"

after getting into a fight.

¶ 29    Mr. Johnson further testified that he first started hearing strange sounds when he was 13 and staying with his father in Mississippi after his father had suffered a stroke. He recalled hearing a loud noise one day that sounded like a fan. Even though he looked around and could not see a fan, the zooming noise would not go away. The noise would come and go, and eventually it turned into a hallucination of a dog that jumped on his back and would speak to him. He testified that the hallucination "followed [him] all the way back to Chicago" and would attack him and sometimes make him attack others. He testified that the hallucination would get into his body and control him, causing him to do things like attack police officers and other inmates. He explained that he avoided sleep because "if I go to sleep it's going to get me." Mr. Johnson explained that since receiving medication, he no longer hears or sees the hallucination. At the time of trial, he was on several drugs including Prozac, Prolixin (an anti-psychotic), and Benadryl.

¶ 30    Mr. Johnson testified that he was first diagnosed with schizophrenia in 1985 at a county jail in Mississippi. While in custody in Mississippi for an armed robbery, he was placed on psychotropic medications for the first time, which seemed to work, but when he was transferred to the Illinois Department of Corrections in 2005, his medications were changed, and the new prescriptions did not work as well. It was around this time that he was released from custody and began to live with Nicole Johnson, his cousin. He testified that he had no memory of going to S.S.'s house and attacking her. He stated that the first time he saw her was in the courtroom when she was testifying. On the day of her attack, he remembered riding his bicycle and drinking alcohol. The next thing he remembered was coming to with handcuffs on and a woman talking to him.

¶ 31    Nicole Smith testified that she met Mr. Johnson in 2005 through his cousin, Nicole Johnson, who she was very close with. She testified that Mr. Johnson came to live with her and

her two daughters (ages 7 and 11 at the time) when he could no longer live with Ms. Johnson because they "weren't getting along." Ms. Smith testified that she noticed his behavior changing. He would pace a lot and "hardly go to sleep," staying up for days. He would get very angry and "just be so aggravated and just weird." She did not recall him taking any medication during the time he lived with her, but he did self-medicate with marijuana, which he smoked multiple times a day. On cross-examination, Ms. Smith stated that at least at the beginning of his stay, she felt comfortable enough with Mr. Johnson that she would sometimes leave her daughters in the house alone with him.

¶ 32    Dr. Linda Grossman, a professor of psychology in the University of Illinois-Chicago Department of Psychiatry and a licensed clinical psychologist testified as an expert witness at Mr. Johnson's trial in case No. 06 CR 11543. She testified that she examined Mr. Johnson when he was in custody at Cook County jail during two visits. In total, her interactions with Mr. Johnson lasted around four hours. She also reviewed his psychiatric and other medical records collected by various authorities over the years, as well as grand jury testimony. She concluded that "Mr. Johnson suffers from a psychotic disorder, which has come on and off, intermittent, throughout many years of his life and which is responsive to medication."

¶ 33    When she first examined Mr. Johnson and wrote her report, Dr. Grossman believed that at the time he assaulted S.S. he was legally sane, but mentally ill. Since forming that initial opinion, however, which she characterized as "greatly rushed," she had "come to think that I cannot 100% rule out that he was insane at the time." However, she was not prepared to conclude that he was insane. "I thought very deeply about these facts *** and it seems to me that the deeper truth is that I don't—I cannot rule out insanity, although, I can't rule it in either."

¶ 34                                    C. The State's Rebuttal

¶ 35    In rebuttal, the State introduced the stipulated testimony of two other expert witnesses that had also testified in case No. 06 CR 11543 on the issue of Mr. Johnson's sanity: Dr. Nishad Nadkarni and Dr. Fidel Echeverria. Unlike Dr. Grossman, who was a psychologist, Drs. Nadkarni and Echeverria were both medical doctors.

¶ 36    Dr. Nadkarni testified that he was a clinical forensic psychiatrist. He explained that in 2008, he was employed by Forensic Clinical Services, a division of the Cook County criminal court system, to evaluate criminal defendants in various capacities, including with respect to their legal sanity. He testified that on August 4, 2008, he received a court order to examine Mr. Johnson for three issues: his sanity at the time of the offense, his capacity to stand trial, and his ability to comprehend what goes on in the courtroom. Prior to examining Mr. Johnson, Dr. Nadkarni reviewed all the materials available to him on Mr. Johnson's medical, psychosocial, and criminal history. He further testified that after completing his examination, he also examined materials previously not available to him, including Dr. Grossman's report and a second evaluation conducted by Dr. Echeverria.

¶ 37    Dr. Nadkarni testified that he interviewed Mr. Johnson on August 4, 2008, and concluded that he was "cognitively intact" and fit to stand trial, possessing a "rather sophisticated understanding of the nature of courtroom proceedings." Dr. Nadkarni further testified that in his opinion, Mr. Johnson did not suffer from a *bona fide* mental illness and did not need medication to maintain his fitness to stand trial. After reviewing the relevant materials and speaking directly with Mr. Johnson, Dr. Nadkarni was of the opinion that Mr. Johnson was not insane. He noted that his medical records from Cook County jail, including his initial screening evaluation conducted at Cermak Health Services, "revealed no mental abnormalities." Further, Mr. Johnson was placed in

the general population, not given any psychiatric treatment, and had at one point been evaluated as "malingering" (faking psychiatric symptoms) in order to try to get out of administrative segregation, where he had been placed after getting into a fight. In another instance, Mr. Johnson had told authorities that he "just needed someone to talk to" and when he was evaluated, he was "essentially found to have no abnormalities of psychosis or mood disorder" and was sent back to the general population.

¶ 38    Dr. Nadkarni also testified to specific details that suggested to him Mr. Johnson was sane at the time of the attack on S.S. Specifically, Dr. Nadkarni noted that Mr. Johnson reportedly asked S.S. to put on sunglasses and a baseball cap when they walked out of her apartment, which suggested to him that he was trying to elude detection. Dr. Nadkarni also expressed skepticism about Mr. Johnson's insinuation that he had blacked out during the attack. In Dr. Nadkarni's view, Mr. Johnson clearly suffered from an alcohol abuse problem, but when he asked Mr. Johnson if he had ever blacked out from drinking before, the only blackouts Mr. Johnson could recall "were in the context of previous criminal behaviors and allegations of things that he had done."

¶ 39    When asked directly by the State about Mr. Johnson's sanity, Dr. Nadkarni stated that it was his opinion, within a reasonable degree of medical and psychiatric certainty, that Mr. Johnson was legally sane at the time of the offense. He further testified that he did not think Mr. Johnson suffered from any type of mental disease or defect.

¶ 40    On cross-examination, Dr. Nadkarni was asked about instances in Mr. Johnson's medical history, including at Cermak Health Services, where he had been diagnosed as schizophrenic. Dr. Nadkarni believed Mr. Johnson was misdiagnosed on those occasions and did not suffer from a mental illness but was instead a malingerer, which he defined as someone who fabricates or exaggerates symptoms for secondary gain.

¶ 41    Dr. Echeverria testified that he was also an employee of Forensic Clinical Services and had been tasked with providing the court with a second opinion regarding Mr. Johnson's fitness to stand trial and sanity. Dr. Echeverria testified that he clinically examined Mr. Johnson on November 1, 2008. In anticipation of his interview, he reviewed the available medical records as well as the summary report prepared by Dr. Nadkarni. Dr. Echeverria agreed with Dr. Nadkarni that Mr. Johnson did not suffer from any *bona fide* psychiatric illness.

¶ 42    Dr. Echeverria also reviewed Mr. Johnson's records from the Mississippi Department of Corrections, which indicated that he was only on medication for 39 of the 93 months he was incarcerated there. To Dr. Echeverria, this long gap of time where Mr. Johnson was not on medication and yet was symptom-free did not indicate a pattern of psychiatric illness. In his view, Mr. Johnson suffered from an antisocial personality disorder, a condition that did not qualify as a mental disease or defect that could impact his ability to understand the nature of his criminal actions during his assault on S.S.

¶ 43    On cross-examination, counsel for Mr. Johnson asked Dr. Echeverria what he made of the fact that Mr. Johnson was currently on four psychotropic medications. Like Dr. Nadkarni, he testified that in his view Mr. Johnson had been misdiagnosed in the past. He also testified that medications treat symptoms, not illnesses *per se*. And in the penal setting, it is common for practitioners to prescribe certain antipsychotic drugs to an inmate to treat specific symptoms like difficulty sleeping and does not necessarily mean that the practitioner believes the inmate is in fact psychotic.

¶ 44    Following closing arguments, the court in this case found Mr. Johnson guilty of aggravated criminal sexual assault, robbery, and kidnapping. It acquitted him on the aggravated kidnapping counts after concluding that E.M. did not suffer great bodily harm. The court rejected Mr.

Johnson's insanity defense, stating that "[t]he activities or the actions that he carried out on that day are actions of a sane individual who was in control of his faculties, who understands the nature of his actions and understands the differences between right or wrong." The court emphasized Mr. Johnson's planning in carrying out the attack on E.M., noting that he hid himself as he waited for E.M., grabbed her from behind, dragged her down the stairs, and absconded with her to the more private mechanical room to commit the assault. The court also stated that "[t]he fact that he had her take off her clothes, the fact that after sex he sat there and smoked a cigarette and then said to her it could have been different. And then had her count to 40 to allow himself an opportunity to leave. All suggest to this court that he understood the nature of his behavior." The court also rejected the defense of guilty but mentally ill.

¶ 45    On August 11, 2010, Mr. Johnson filed a motion for a new trial, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt, (2) the court erred in failing to find him guilty but mentally ill, and (3) the court failed to make a specific finding that he was not suffering from a mental illness at the time of the commission of the offense. Following a hearing on August 17, 2010, the court denied the motion.

¶ 46    The court sentenced Mr. Johnson to 15 years for each of the two counts of aggravated criminal sexual assault (one count for anal penetration and one count for vaginal penetration), to run consecutive to each other and to the sentence imposed in case No. 06 CR 11543. The court further sentenced Mr. Johnson to 6 years for the kidnapping and 6 years for the robbery, to run concurrently with each other. Thus, in total, Mr. Johnson received consecutive sentences of 36 years for his crimes against E.M. and 80 years for his crimes against S.S. This appeal followed.

¶ 47                                    II. JURISDICTION

¶ 48    Mr. Johnson was sentenced on August 17, 2010. On June 21, 2022, the Illinois Supreme

Court issued a supervisory order granting him leave to file a late notice of appeal, which he did on July 7, 2022. We have jurisdiction over this appeal under article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb 6, 2013) and 606 (eff. July 1, 2017), governing appeals from final judgments in criminal cases.

¶ 49                                    III. ANALYSIS

¶ 50    Mr. Johnson argues on appeal that the trial court's finding that he was legally sane at the time of his offenses against E.M. was against the manifest weight of the evidence. His convictions should be reversed, he asserts, because at the time of the offenses he suffered schizophrenic delusions that left him unable to appreciate the criminality of his conduct.

¶ 51    Before addressing the merits of Mr. Johnson's argument, we first briefly consider the State's assertion that Mr. Johnson failed to preserve it. Our supreme court has repeatedly held that to properly preserve an issue for appeal, a defendant must object at trial and raise the issue in a written posttrial motion. *People v. Jackson*, 2022 IL 127256, ¶ 15. Failure to do so "forfeits any review of the error." *Id.* The State contends that Mr. Johnson forfeited review of the issue of his sanity because he "failed to include the claim that the trial court erred in finding him legally sane at the time of the offense in his post-trial motion," an oversight that "denied the trial court an opportunity to correct any potential error in a timely fashion." We disagree and find that this issue was properly preserved for review.

¶ 52    In his motion for a new trial, filed August 11, 2010, one of the reasons Mr. Johnson provided for why he was entitled to a new trial was that, in his view, the court failed "to make a specific finding that the [he] was not suffering from a mental illness at the time of the commission of the offense." This assertion addressed a central element of Mr. Johnson's insanity defense: whether, at the time of the criminal conduct, and *as a result of mental disease or mental defect*, he

15

lacked the substantial capacity to appreciate the criminality of his conduct. 720 ILCS 5/6-2(a) (West 2006). Further, the State's contention that Mr. Johnson's failure to specifically challenge the court's ultimate ruling on the insanity issue in his posttrial motion "denied the trial court an opportunity to correct any potential error in a timely faction" is completely undermined by the transcript of the hearing on Mr. Johnson's motion for a new trial. During that hearing, held on August 17, 2020, the court specifically revisited its ruling on Mr. Johnson's sanity and stated: "based on my re-reading of those notes and the transcripts *** I am convinced that Mr. Johnson was not suffering from any disease or mental defect that prevented him from appreciating the criminality of his conduct or performing his conduct to the requirements of the law." The court clearly viewed Mr. Johnson's posttrial motion as a challenge to its ruling on his insanity defense. Rejecting the State's forfeiture argument, we next address the merits of Mr. Johnson's claim.

¶ 53 The insanity defense on which Mr. Johnson relies is codified in section 6-2(a) of the Code, which provides that "[a] person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct." 720 ILCS 5/6-2(a) (West 2006). The defendant has the burden of proving this defense by clear and convincing evidence. *Id.* § 6-2(e). Evidence is clear and convincing where it "leaves no reasonable doubt in the mind of the fact finder as to the truth of the proposition in question." *Bazydlo v. Volant*, 164 Ill. 2d 207, 213 (1995). As a question of fact, a trial court's determination on the issue of a defendant's sanity will not be reversed unless it is contrary to the manifest weight of the evidence. *People v. Urdiales*, 225 Ill. 2d 354, 428 (2007). A finding is against the manifest weight of the evidence only "if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). In our view, the trial court's determination that Mr.

16

Johnson was legally sane at the time he assaulted E.M. was not against the manifest weight of the evidence.

¶ 54    In announcing its ruling, the trial court stated that it found the testimony of E.M. to be "very credible" and it pointed to several specific aspects of her testimony which suggested to the court that Mr. Johnson understood the criminality of his actions. The court was particularly struck by the degree of planning involved in Mr. Johnson's ambush of E.M. in the stairwell and the evasive precautions he took both during and after the assault:

> "There's no doubt in this Court's mind due to the planning that offense took, the fact he secreted himself in a hidden place until [E.M.] was walking up the stairs, the fact he grabbed her from behind, dragged her a certain distance and apparently went back to the front door to make sure he was not being observed and then took her through the laundry room into the mechanical room, all of that evidence is to this court that he understood exactly what he was doing.
>
> The fact that he had her take off her clothes, the fact that after sex he sat there and smoked a cigarette and then said to her it could have been different. And then had her count to 40 to allow himself an opportunity to leave. All suggest to this court that he understood the nature of his behavior and because of that, this court finds he was sane at the time of the offense."

As the State notes in its brief, there were additional details in the record, which the court did not specifically highlight in its ruling, which further supported the court's reasoning. Most notably the fact that after raping E.M., Mr. Johnson used her shirt to wipe off all the surfaces he had touched (presumably to prevent the authorities from retrieving his fingerprints).

¶ 55    Mr. Johnson does not dispute these facts but asserts that the court should have relied instead

17

on other evidence in the record which he argues supported a finding of insanity. Specifically, Mr. Johnson points to his own testimony that he suffered from severe hallucinations and blackouts—testimony he argues was supported by the accounts given by Nicole Smith and Nicole Johnson, "two witnesses who knew him intimately," as well as the testimony from Dr. Grossman. He also notes, without citing anything in the record or any legal authority or academic literature, that the timing of the assault suggests a sudden psychotic break, as he was 40 years old at the time of the incident and had never before been accused of a sexually motivated crime.

¶ 56    All of these arguments were heard by the trial court, considered, and rejected. The trial court found Mr. Johnson's testimony about his hallucinations and blackouts to be either not credible or not determinative. It is not our role to second guess the weight a fact finder gives to the evidence. See *Deleon*, 227 Ill. 2d at 332 ("A reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn."). While the testimony of Mr. Johnson's other witnesses, Ms. Smith and Ms. Johnson, supported an inference that Mr. Johnson was emotionally disturbed and had unmet psychological needs and substance abuse issues, it did not definitively establish or even suggest that he was legally insane.

¶ 57    Finally, Dr. Grossman was just one of three expert witnesses to opine on the issue of Mr. Johnson's sanity, and even she would not conclusively state that Mr. Johnson was insane at the time of the charged offenses. The other two experts, Dr. Nadkarni and Dr. Echeverria, both concluded that Mr. Johnson was *not* insane, and that he instead fit the profile of a malingerer, someone who fakes or exaggerates mental illness to avoid accountability for his actions.

¶ 58    Mr. Johnson contends that the court should have rejected the opinions of Dr. Nadkarni and Dr. Echeverria because they placed too much emphasis on the results of a mental health screening

conducted at Cermak Health Services when Mr. Johnson was first arrested and because they unreasonably concluded that the doctors that had previously diagnosed Mr. Johnson as having a mental illness were mistaken. We disagree.

¶ 59    Both Dr. Nadkarni and Dr. Echeverria provided specific reasons, going beyond the screening evaluation at Cermak Health Services, for why they believed Mr. Johnson was a malingerer rather than someone who suffered from a *bona fide* mental illness. Dr. Nadkarni testified that he was skeptical of Mr. Johnson's assertion that he suffered from alcohol-related blackouts, noting that when he asked Mr. Johnson if he had ever blacked out from drinking before, the only blackouts Mr. Johnson could recall "were in the context of previous criminal behaviors and allegations of things that he had done." Dr. Echeverria testified that he had examined Mr. Johnson's medical records from the Mississippi Department of Corrections and noticed that Mr. Johnson had been unmedicated and seemingly symptom-free for the majority of his incarceration there, which was inconsistent with someone suffering from a *bona fide* mental illness.

¶ 60    Although these testifying doctors expressed some disagreement with some of the diagnoses that Mr. Johnson had been given at various points, no evidence was presented to support any of those prior diagnoses nor did any of those diagnosing doctors opine on Mr. Johnson's sanity at the time of the offenses in this case.

¶ 61    We also find it significant that the trial court relied more on lay testimony than on any of the expert testimony. As we discuss *supra* in paragraph 54, the court was quite swayed by specific facts from *E.M.*'s own testimony regarding Mr. Johnson's efforts to avoid detection and prosecution. Indeed, the court did not even mention testimony from the expert witnesses until the hearing on Mr. Johnson's motion for a new trial.

¶ 62    There was nothing improper about the court's focus on lay witness testimony over expert

testimony on the question of Mr. Johnson's sanity. As this court has noted, a "trier of fact may reject expert testimony that a defendant was insane at the time of the offense and conclude that the defendant was sane based solely on lay testimony." *People v. Camden*, 219 Ill. App. 3d 124, 134 (1991); see also *People v. McCollum*, 386 Ill. App. 3d 495, 504-05 (2008) ("Expert testimony may be entirely rejected by the trier of fact if he or she concludes a defendant was sane based on factors such as: whether lay testimony is based on observations made shortly before or after the crime; the existence of a plan for the crime; and methods undertaken by the defendant to prevent detection.").

¶ 63    In sum, the trial court's rejection of Mr. Johnson's insanity defense was not against the manifest weight of the evidence.

¶ 64                                      IV. CONCLUSION

¶ 65    For the reasons stated above, we affirm the judgment of the circuit court.

¶ 66    Affirmed.