Docket No. 103777.

IN THE

SUPREME COURT

OF

THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
MIGUEL DELEON, Appellant.

*Opinion filed January 25, 2008.*

CHIEF JUSTICE THOMAS delivered the judgment of the court,
with opinion.

Justices Freeman, Fitzgerald, Kilbride, Garman, Karmeier, and
Burke concurred in the judgment and opinion.

**OPINION**

Following a bench trial, defendant, Miguel Deleon, was convicted
of first degree murder (720 ILCS 5/9–1(a)(1) (West 1996)) and
attempted first degree murder (720 ILCS 5/8–4, 9–1(a)(1) (West
1996)). The trial court sentenced him to a mandatory life term for the
first degree murder and a consecutive 30-year term for the attempted
first degree murder. Defendant appealed, and the appellate court
affirmed both the convictions and the sentences. *People v. Deleon*,
No. 1–99–0028 (2000) (unpublished order under Supreme Court Rule
23). Later, defendant filed a postconviction petition arguing that the
mandatory life term must be vacated because the statute authorizing
it was invalidated in *People v. Wooters*, 188 Ill. 2d 500 (1999). The
trial court summarily dismissed the petition. Defendant appealed, and

the appellate court vacated defendant's life sentence and remanded for a new sentencing hearing. *People v. Deleon*, No. 1–01–2469 (2003) (unpublished order under Supreme Court Rule 23). At the resentencing hearing, the trial court imposed a 100-year extended-term sentence for the first degree murder and again imposed a consecutive 30-year sentence for the attempted first degree murder. Defendant appealed, and the appellate court affirmed the sentences. No. 1–04–2934 (unpublished order under Supreme Court Rule 23). We allowed defendant's petition for leave to appeal. 210 Ill. 2d R. 315(a).

## BACKGROUND

Defendant was a member of the Imperial Gangsters, a rival gang of the Latin Kings. On the afternoon of April 4, 1997, defendant met with some of his fellow gang members in "the Jungle," a neighborhood located near the intersection of Mannheim Road and Crown Road in Franklin Park. Defendant was providing "security" for the Imperial Gangsters that day, which means he carried a gun in the event of an altercation with the Latin Kings. At some point, defendant and his cohorts noticed a red Ford Mustang driving westward on Crown Road. Because the car bore a Stone Park registration sticker and contained a "crown air freshener," the Imperial Gangsters surmised that it belonged to a Latin King. When someone yelled "flakes," a term meaning "rival gang member," defendant and another Imperial Gangster ran through an apartment complex to intercept the Mustang on Schiller Street. When the Mustang appeared on Schiller Street, defendant and one of his fellow gang members stepped into the street and stopped the car. An altercation ensued, and, from a distance of three feet, defendant fired two shots through the driver's side windshield. One of those shots hit the driver, Jose Sanchez, in the chest. Sanchez sped away toward Mannheim Road, passing an ice cream truck surrounded by children. Defendant continued firing at Sanchez, and seven-year-old Juana Nieto, who was standing beside the ice cream truck, was shot and killed. A three-year-old boy and the ice cream truck driver also sustained injuries.

At trial, Sanchez testified that, after hearing the initial gunshots, he felt a "burning in [his] chest." As he sped toward Mannheim Road, Sanchez noticed an ice cream truck that was parked on Schiller Street

-2-

and surrounded by children. When he reached Mannheim Road, Sanchez drove to a gas station located at the corner of Mannheim Road and Grand Avenue, a distance of approximately 1,500 feet from the scene of the shooting.[1] At the gas station, Sanchez continued to feel the burning in his chest and "felt something running in the back." As he exited the Mustang, Sanchez recovered the bullet "from [his] back." When asked directly whether the bullet "went through" his body, Sanchez answered "yes." Similarly, Sanchez answered "yes" when asked whether the bullet "exited" his body and when asked whether the bullet "[came] out of" his back. After recovering the bullet, Sanchez went inside the gas station and asked for help. When the police arrived, Sanchez handed the bullet to an officer. Sanchez was then taken by ambulance to Loyola University Hospital. Photographs taken at the hospital depict a bullet wound in the left center of Sanchez's chest.

The trial court found defendant guilty of the first degree murder of Juana Nieto and the attempted first degree murder of Jose Sanchez. At the same time, the trial court acquitted defendant of the attempted first degree murders of the three-year-old boy and the ice cream truck driver, both of whom sustained wounds during the shooting. Following a sentencing hearing, the trial court imposed a mandatory life term for the first degree murder conviction, based on the fact that defendant was 17 years old at the time of the offense and the victim was under the age of 12. See 730 ILCS 5/5–8–1(a)(1)(c)(ii) (West 1996). For the attempted first degree murder conviction, the trial court imposed a consecutive sentence of 30 years in prison. See 730 ILCS 5/5–8–4(a) (West 1996). In the course of imposing these sentences, the trial court specifically found that Sanchez "was struck through the chest" and that "the bullet went through his chest and in fact exited his back." The court also noted that, as a result of defendant's conduct, "the individual who was driving the ice cream truck was struck and injured" and "another child on the street was struck in the neck and injured."

---

[1]Although this distance is not a part of the record on appeal, this court may take judicial notice of the distances between two locations. See *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 177-78 (2003).

Defendant appealed, and the appellate court affirmed both the convictions and the sentences. *Deleon*, No. 1–99–0028 (unpublished order under Supreme Court Rule 23). Later, defendant filed a postconviction petition arguing that his mandatory life term must be vacated because Public Act 89–203, which enacted the relevant mandatory sentencing provision, was invalidated in *People v. Wooters*, 188 Ill. 2d 500 (1999). The trial court summarily dismissed the petition, and defendant appealed. Citing *Wooters*, the appellate court vacated defendant's life sentence and remanded for resentencing under the law that was in effect prior to the enactment of Public Act 89–203. *Deleon*, No. 1–01–2469 (unpublished order under Supreme Court Rule 23).

Following the remand, defendant was appointed new counsel. In hopes of ascertaining new mitigation evidence, defense counsel subpoenaed defendant's records from the Illinois Department of Corrections (hereinafter, Corrections). Because such records "shall be confidential" (730 ILCS 5/3–5–1(b) (West 1996)), the trial court examined defendant's Corrections file *in camera*. Following the examination, the trial court offered the following summary in open court:

> "The positive part of the documents is one page which would show that Mr. Deleon passed his G.E.D. test. The other documents I think, unfortunately, well, I won't go any further. That's the only document"

The trial court then offered to make that single page available to defense counsel, and defense counsel responded, "That would be sufficient, Judge."

Defendant's resentencing hearing was held several weeks later. At the start, defense counsel acknowledged that he had received a copy of defendant's new presentencing investigation (PSI) report and that he had reviewed that report with defendant. Among other things, the PSI report noted that defendant had obtained his G.E.D. while incarcerated, had been working steadily since arriving in prison and even received a promotion, and was housed in the "very low aggressive cell house." The report also included a long statement of remorse from defendant, in which he explained that he was "young at the time," that he "never intended to hurt her," and that he "wish[ed] he could take it all back." Defendant also stated that Juana Nieto's

murder "haunts me every day" and "is something I have to live with for the rest of my life." Elsewhere in the PSI report, defendant asks the court to understand that he "didn't do it," that he's "still young," and that all he wants is the "chance to be young and free and with my family."

In aggravation, the State recounted the facts of the case. At one point, the trial court interjected that it recalled the case well and offered the following summary of the relevant facts:

> "As I remember it, we had a [gang member] who was over in Franklin Park who saw an individual who is driving through what is called *** the jungle of Franklin Park. And he chased the car, shot the individual. That individual received a shot in the chest. And he drove to an emergency facility where the bullet fell out of his back and he survived. But during that same shooting, there were some children over by an ice cream truck. And it was the shooting as he ran around the car [that] affected the children there, killing the twelve year old, wounding the three year old, and, in fact, I believe, striking the driver of the ice cream truck."

The State then asked the trial court once again to impose a consecutive 30-year sentence for the attempted murder conviction. In so doing, the State reminded the trial court of its previous finding that the gunshot wound to Sanchez's chest was a severe bodily injury. For the first degree murder conviction, the State requested an extended-term sentence of 100 years, based upon the victim's age. See 730 ILCS 5/5–5–3.2(b)(4)(i), 5–8–2(a)(1) (West 1996).

In response, defense counsel focused primarily on the United States Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). Defense counsel argued strenuously that *Apprendi* precluded the imposition of an extended-term sentence for defendant's first degree murder conviction because the relevant statutory aggravating factor–that Juana Nieto was under the age of 12 at the time of the offense–was neither pled in the indictment nor proven beyond a reasonable doubt. In addition, defense counsel asked the court to consider the information contained in the PSI report, including "defendant's statement in that report of some remorse."

Before imposing sentence, the trial court stated that it had reviewed "the transcripts and the facts of the case," as well as the PSI report. The trial court then imposed an extended-term sentence of 100 years in prison for the first degree murder conviction and a consecutive sentence of 30 years in prison for the attempted first degree murder conviction. Three weeks later, defense counsel filed a motion to reconsider the sentence in which he reiterated his *Apprendi* argument. Specifically, defense counsel argued that "the Court did not, at the time of trial, specifically find that the age of the victim was proven beyond a reasonable doubt." Defense counsel also acknowledged, however, that he was "working without the benefit of a transcript of the Court's original finding." The trial court denied the motion to reconsider sentence, and defendant appealed.

On appeal, defendant argued, *inter alia*, that (1) his new defense counsel was ineffective because he neither obtained nor reviewed the trial transcripts prior to the resentencing hearing; (2) the trial court erred by not allowing defense counsel to examine the nonconfidential portions of defendant's Corrections records; and (3) the evidence did not support the trial court's finding that, for consecutive sentencing purposes, Sanchez's gunshot wound was a "severe bodily injury." The appellate court rejected each of these arguments and affirmed defendant's sentences. No. 1–04–2934 (unpublished under Supreme Court Rule 23).

In addition to his brief, defendant filed a motion asking the appellate court to conduct an independent review of defendant's Corrections file "to ascertain the correctness of the trial court's ruling regarding the existence of mitigation evidence." At the conclusion of that motion, defendant informed the court that, "[b]ecause the [Corrections] file is in the hands of [Corrections], defendant cannot obtain the record himself and have it certified as a supplemental record." Although the State advised the appellate court that it had no objection to defendant's request, the appellate court entered an order denying defendant's motion without comment.

We allowed defendant's petition for leave to appeal. 210 Ill. 2d R. 315(a).

## DISCUSSION

### Severe Bodily Injury

Defendant's first argument is that the trial court erred in imposing a consecutive sentence for the attempted first degree murder conviction. The governing statute on this point is section 5–8–4(a) of the Unified Code of Corrections, which at the relevant time stated:

> "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony *and the defendant inflicted severe bodily injury* \*\*\* in which event the court shall enter sentences to run consecutively." (Emphasis added.) 730 ILCS 5/5–8–4(a) (West 1996).

According to defendant, the imposition of consecutive sentences in this case is unwarranted because, although attempted first degree murder is undeniably a Class X felony, the record does not support the trial court's finding that defendant inflicted "severe bodily injury" upon Jose Sanchez.

As a preliminary matter, we must determine the appropriate standard of review for a trial court's determination that, for consecutive sentencing purposes, a bodily injury is "severe." Defendant argues that such review requires interpreting the statutory phrase "severe bodily injury" and that a *de novo* standard is therefore warranted.[2] The State responds that whether a particular injury is "severe" is a question of fact and that a manifest weight standard is therefore warranted. We agree with the State. In *People v. Crespo*, 203 Ill. 2d 335, 344 (2001), this court held that what constitutes "great bodily harm" under the aggravated battery statute (see 720 ILCS 5/12–4(a) (West 2006)) is a question properly left to the fact

---

[2]In his opening brief, defendant maintains that a *de novo* standard is likewise warranted because "this case involves application of section 5–8–4(a) to undisputed facts in the record." In his reply brief, however, defendant concedes that one of the principal facts relevant to this issue–whether the bullet fired into Sanchez's chest exited through Sanchez's back–*is* in dispute.

finder. We see no reason to treat the question of what constitutes "severe bodily injury" any differently. If the fact finder can be trusted to sort out which bodily harms are "great," it can certainly be trusted to sort out which bodily injuries are "severe." Accordingly, we hold that a trial court's determination that a bodily injury is "severe" for purposes of consecutive sentencing may be reversed only if it is against the manifest weight of the evidence.

A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented. *In re D.F.*, 201 Ill. 2d 476, 498 (2002). Under the manifest weight standard, we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and witnesses. *D.F.*, 201 Ill. 2d at 498-99. A reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn. *D.F.*, 201 Ill. 2d at 499.

Here, the evidence is more than sufficient to support the trial court's finding that Sanchez sustained a "severe bodily injury." One of defendant's fellow gang members testified that defendant shot Sanchez in the chest from a distance of approximately three feet. The photographs introduced by the State reveal a bullet wound to the left center of Sanchez's chest. Sanchez testified that, after being shot, he felt a "burning in [his] chest." And while the photographs do not depict an exit wound, the State asked Sanchez three different times, and in three different ways, whether the bullet passed through his body and exited through his back. Each time, he responded "yes." Given this evidence, the trial court was entirely justified in concluding that Sanchez "was struck through the chest," that "the bullet went through his chest and in fact exited his back," and that such an injury is sufficiently "severe" to justify a consecutive sentence.

In opposition to this result, defendant makes two arguments. First, defendant points to the following exchange between the prosecutor and Sanchez:

"Q. Where did the bullet go through your body? At what point did it come out?

> A. It came out–it didn't go all the way through because I had a sweater. When I got out on the street, it started running down. I got it in my hand when I got out of the car."

According to defendant, Sanchez's statement that "it didn't go all the way through because I had a sweater" confirms that the bullet did *not* pass through Sanchez's body but instead only "graz[ed] his chest." Consequently, defendant argues, the trial court's findings that Sanchez "was struck through the chest" and that "the bullet went through his chest and in fact exited his back" are not supported by the evidence.

Defendant reads too much into this isolated, and at best ambiguous, piece of testimony. According to defendant, when Sanchez stated that "it didn't go all the way through because I had a sweater," Sanchez must have meant that the bullet did not go all the way through *his body*. But it is also possible that Sanchez meant that the bullet did not pass through *his sweater*. Indeed, Sanchez was asked not only where the bullet had passed through his body, but also where the bullet had "come out." Sanchez's response begins with the statement "It came out." Only then does Sanchez add that "it didn't go all the way through because I had a sweater." It is certainly reasonable to read this answer as saying "it came out of my body but was caught by my sweater," which, after all, comports with Sanchez's three unequivocal affirmations that the bullet did in fact pass through his body and exit his back. At the very least, we cannot say that the foregoing exchange renders the trial court's understanding of Sanchez's testimony "unreasonable, arbitrary, or not based on the evidence presented."

Second, defendant argues that Sanchez's behavior after being shot confirms that he did not sustain a "severe bodily injury." Specifically, defendant points out that, despite his gunshot wound, Sanchez was able to drive away from the scene, notice an ice cream truck surrounded by children, get himself to a nearby gas station, collect the bullet from his sweater, enter the gas station and ask for help, and wait for the police to arrive. Moreover, defendant notes that, although Sanchez was taken to the hospital for the treatment of his gunshot wound, the State presented no evidence concerning the length of his hospital stay, the nature of his treatment, or the intensity of his pain. According to defendant, these facts confirm that Sanchez's injury was "not the type of debilitating or extreme injury contemplated by the

legislature that warrants the mandatory imposition of consecutive sentences."

We disagree. We have already concluded that the evidence adequately supports the trial court's findings that Sanchez "was struck through the chest" and that "the bullet went through his chest and in fact exited his back." Irrespective of the victim's postshooting behavior, we would have no difficulty affirming that a wound of that nature constitutes "severe bodily injury." That said, defendant's argument on this point is severely undermined by this court's decision in *People v. Johnson*, 149 Ill. 2d 118 (1992), which the State cites and defendant does not address. In *Johnson*, this court found that "severe bodily injury" was sufficiently proven where, after being shot once in the shoulder, the victim walked out of the apartment where the shooting occurred, flagged down a passing motorist, told the driver there had been a robbery and a shooting, and had the motorist drive him to a hospital. See *Johnson*, 149 Ill. 2d at 128-29, 159. Sanchez's postshooting behavior is not materially different from the *Johnson* victim's, and there is no reason to believe that Sanchez's gunshot wound was any less "severe" than the *Johnson* victim's gunshot wound. Accordingly, we reject any suggestion that Sanchez's postshooting conduct renders benign his through-and-through gunshot wound to the chest.

### Ineffective Assistance

Defendant next argues that defense counsel provided ineffective assistance at the resentencing hearing. This argument takes two basic forms, and we will address each in turn.

### *Failure to Read the Record and Transcripts*

Defendant first argues that his resentencing counsel was *per se* ineffective because the record establishes that counsel, who did not represent defendant at the original trial and sentencing hearing, never read the original trial and sentencing transcripts. In support of this argument, defendant points to the following statement, which appeared in the motion to reconsider sentence that counsel filed on defendant's behalf:

-10-

"Counsel for defendant maintains, that the Court did not, at the time of trial, specifically find that the age of the victim was proven beyond a reasonable doubt, *while acknowledging that counsel is working without the benefit of a transcript of the Court's original finding*." (Emphasis added.)

According to defendant, this statement makes it "apparent that [counsel] never read Deleon's trial transcripts in preparation for the [resentencing] hearing." Moreover, given the gravity of such an omission, defendant insists that he "should not be required to prove the prejudicial effect of this error."

The State responds that defendant's argument rests on a faulty factual premise. According to the State, the above statement in no way proves that counsel "never read Deleon's trial transcripts in preparation for the [resentencing] hearing." On the contrary, the above statement appeared in counsel's motion for reconsideration of sentence, which was filed three weeks after both the resentencing hearing and the imposition of sentence. Thus, the State maintains, the most it proves is that counsel prepared *that motion* without the benefit of a trial transcript. The State also notes that the original trial and sentencing transcripts were available to counsel prior to the resentencing hearing, and there are other comments from counsel that suggest a working familiarity with the trial record.

We agree with the State. The record simply does not support defendant's claim. In relation to one of the factual assertions contained in the motion to reconsider sentence, counsel conceded that he was "working without the benefit of a transcript." From this concession, defendant asks this court to infer that counsel had been "working without the benefit of a transcript" all along, even prior to the resentencing hearing itself. Like the appellate court, we are unwilling to draw such an inference, as it dramatically exceeds the scope of counsel's concession. All that reasonably can be inferred from counsel's concession is that he was "working without the benefit of a transcript" at the time he prepared the motion to reconsider sentence. The concession appears exclusively in that motion, and nothing about it implicates counsel's performance at or before the resentencing hearing itself. Of course, this is no way proves that counsel actually *read* the original trial and sentencing transcripts prior to the resentencing hearing. On the record before us, as with most

appellate records, we have no way of knowing one way or the other. But that is sufficient to defeat defendant's claim, as "[a] defendant cannot rely on speculation or conjecture to justify his claim of incompetent representation." *People v. Pecoraro*, 175 Ill. 2d 294, 324 (1997).

*Other Ineffectiveness Claims*

Defendant's second ineffectiveness claim is different but related. Essentially, defendant argues that counsel's failure to review the original trial and sentencing transcripts caused counsel to commit a series of prejudicial errors at the resentencing hearing. As we will discuss more fully below, these alleged "errors" were not in fact errors. Before getting to that, however, we wish to reiterate that the record in no way supports defendant's repeated assertion that counsel failed to review the original trial record. Consequently, to the extent that defendant attributes counsel's alleged failings to a lack of familiarity with the record, we reject his argument out of hand.

In determining whether a defendant was denied the effective assistance of counsel, we apply the familiar two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), and adopted by this court in *People v. Albanese*, 104 Ill. 2d 504 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064 (1984). More specifically, the defendant must demonstrate that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. The failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

Defendant's first claim is that counsel failed to correct the trial court's mistaken belief that an extended-term sentence was mandatory in this case. In support of this claim, defendant points to the trial court's statement at the resentencing hearing that defendant was

"entitled to" an extended-term sentence. According to defendant, the use of the phrase "entitled to" suggests that the trial court "was not aware that the imposition of an extended term was discretionary." In fact, the phrase "entitled to" suggests no such thing. As defined by Webster's, "entitle" means "to qualify (one) for something." Webster's Third New International Dictionary 758 (1993). Similarly, Black's defines "entitle" as "to *** qualify for." Black's Law Dictionary 573 (8th ed. 2004). Clearly, defendant was "qualified for" an extended-term sentence, as he stood convicted of murdering a seven-year-old girl. The trial court's statement merely reflects this obvious reality, and counsel therefore was under no obligation to say otherwise.

Defendant's second claim is that counsel was ineffective for failing to argue defendant's youth, remorse, and good prison behavior as mitigating factors. Again, this claim is contradicted by the record. The record shows that counsel specifically argued defendant's remorse as a mitigating factor, and defendant personally expressed his remorse to the trial court just prior to sentencing. As for defendant's age and positive prison record, all of that was set forth in the PSI report, which the trial court read and which counsel specifically asked the trial court to take into account when arguing against an extended-term sentence.[3]

Defendant's third claim is that counsel was ineffective for failing to argue that Jose Sanchez did not suffer a severe bodily injury and that consecutive sentences were therefore impermissible. On this point, there is an obvious lack of prejudice, as we have already determined that the evidence more than supports the trial court's severe bodily injury finding. Moreover, counsel reasonably could have concluded that any such argument was futile. The trial court determined at the original sentencing hearing that Jose Sanchez sustained a severe bodily injury, and the only reason for the remand was that defendant's *other* sentence was invalid. Under these circumstances, counsel had little reason to expect that the trial court

---

[3]Admittedly, counsel's sentencing presentation focused far more on *Apprendi* than it did on the mitigating evidence described above. But that is not defendant's argument. Defendant's argument is that counsel "failed to make any arguments in mitigation," and that simply is not the case.

would reverse itself, and his decision not to contest the severe bodily injury finding therefore was reasonable.

Defendant's final claim is that counsel was ineffective for failing to correct the trial court's "implication" that defendant was "adjudged responsible for" shooting and wounding the three-year-old boy and the ice cream truck driver. In support, defendant points to the trial court's observation at the resentencing hearing that, after shooting Sanchez in the chest, defendant continued firing, "killing the twelve year old [*sic*], wounding the three-year-old, and, in fact, I believe, striking the driver of the ice cream truck." According to defendant, counsel should have reminded the trial court that defendant was actually *acquitted* of the attempted murder charges that arose from those two shootings, thereby ensuring that the trial court "did not consider these findings in resentencing Deleon."

Defendant's argument is without merit. It is well established that "evidence of criminal conduct can be considered at sentencing even if the defendant previously had been acquitted of that conduct." *People v. Jackson*, 149 Ill. 2d 540, 549-50 (1992). Here, there is no dispute that the trial court acquitted defendant of the attempted murder charges arising from the shooting and wounding of the three-year-old boy and the ice cream truck driver. Nevertheless, it is equally clear that the trial court remained convinced that defendant did in fact shoot and wound both the boy and the driver. At defendant's original sentencing hearing, which was held just 30 days after the trial court acquitted defendant of the two attempted murder counts, the trial court specifically found that, as a result of defendant's conduct, "the individual who was driving the ice cream truck was struck and injured" and "another child on the street was struck in the neck and injured." The trial court then repeated these findings at the resentencing hearing. Under *Jackson*, these findings were perfectly proper, and the trial court was fully entitled to take them into account when fashioning defendant's sentences. Counsel had nothing to correct and no basis to object.

### Defendant's Corrections File

Defendant's final argument is that the appellate court erred in refusing to conduct an independent review of defendant's Corrections

file and "ascertain the correctness of the trial court's ruling regarding the existence of mitigation evidence." According to defendant, that refusal "effectively denied Deleon review of the trial court's ruling, thereby infringing his *** constitutional right to appeal." By way of remedy, defendant asks this court to conduct its own review of defendant's Corrections records and to remand the cause for a new sentencing hearing if the file contains additional potentially mitigating evidence.

There is a fatal problem with defendant's argument, and it relates to the concession that defendant made in his appellate court motion: defendant's Corrections file is not part of the record on appeal. Rather, the file was returned to the Department of Corrections after the resentencing hearing, and with Corrections it remains. Though the appellate court did not give a reason for denying defendant's motion, this is almost certainly it. The relevant records were not part of the record, and the appellate court therefore had nothing to review, even if it were so inclined.

In this court, the State directs our attention to Supreme Court Rules 415(e) and 415(f) (134 Ill. 2d Rs. 415(e), (f)). In relevant part, Rule 415(e) states that "[m]aterial excised pursuant to judicial order shall be sealed, impounded and preserved in the records of the court, to be made available to the reviewing court in the event of an appeal." 134 Ill. 2d R. 415(e). Similarly, Rule 415(f) states that, "[i]f the court enters an order granting relief following a showing *in camera*, the entire record of such showing shall be sealed, impounded, and preserved in the records of the court, to be made available to the reviewing court in the event of an appeal." 134 Ill. 2d R. 415(f). The State argues that, having failed to ensure that the undisclosed portion of his Corrections file was "sealed, impounded, and preserved in the records of the court," defendant has waived any right to review of the trial court's reading of that file. Defendant responds that "nothing in the language of these rules puts the burden on the defendant to assure compliance with this procedure." Rather, "[a]s only the trial court had access to the documents, it was its burden to comply with Supreme Court Rule 415."

Defendant's argument is precluded by this court's decision in *People v. Coates*, 109 Ill. 2d 431 (1985). In that case, the defendant sought to subpoena certain records from the Department of Children

and Family Services for purposes of impeachment. Because such records ordinarily are kept confidential, the trial court conducted an *in camera* inspection of the records. As in this case, neither the State nor defense counsel was present for the inspection. Following the inspection, the trial court allowed the defendant to use only certain portions of the Department's records, keeping the remainder under seal. On appeal, the defendant argued, *inter alia*, that the trial court erred in failing to comply with Rule 415(f), "in that it made no record of the proceedings *in camera* and failed to seal, impound and preserve the records involved." *Coates*, 109 Ill. 2d at 438. This court rejected that argument, stating that "[t]he record fails to show that defendant requested any such action, and under the circumstances, there is nothing before us for review." *Coates*, 109 Ill. 2d at 438. In other words, and contrary to defendant's argument, the burden "to assure compliance with this procedure" *does* rest with the complaining party, at least in the first instance. And absent a request for such compliance, any deficiency in the record will be attributable that party.

The bottom line is that it is *the appellant's* burden to present a sufficiently complete record of the proceedings below to support a claim of error and, in the absence of a complete record on appeal, it will be presumed that the order entered by the circuit court was in conformity with the law and had a sufficient factual basis. *People v. Fair*, 193 Ill. 2d 256, 264 (2000). Here, defendant is asking this court to review the accuracy of the trial court's reading of defendant's Corrections file. However, that file is not part of the record, and defendant never requested that it be made part of the record. Consequently, as in *Coates*, "there is nothing before us for review."

## CONCLUSION

For the foregoing reasons, the judgment of the appellate court is affirmed.

*Affirmed.*