2024 IL App (1st) 232173-U

Sixth Division
February 2, 2024

No. 1-23-2173B

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 22 CR 1046601 |
| | ) | |
| | ) | Honorable |
| Joel Johnson, | ) | Margaret Ogaret, |
| | ) | Judge, Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE TAILOR delivered the judgment of the court.
Presiding Justice Oden Johnson and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1 Defendant-appellant Joel Johnson appeals under Illinois Supreme Court Rule 604(h) (eff. Sept. 18, 2023) from the circuit court's order entered on November 2, 2023, which denied him pretrial release under Public Act 101-652 (eff. Jan. 1, 2023), commonly known as the Pretrial Fairness Act.

¶ 2 On August 18, 2022, Johnson was arrested and charged with first-degree murder (720 ILCS 5/9-1(a)(2) (West 2022)). The charge was based on allegations that Johnson forcefully shook his nine-week-old baby, J.J., which caused his death. The court set Johnson's bail at $10 million and

required him to have no contact with his girlfriend, Kaylee, their older son, J.J., or with Kaylee's other child, W.M.. Because Johnson could not pay the bond, he was detained. On September 15, 2022, a grand jury indicted Johnson on two counts of murder.

¶ 3    On September 22, 2022, Johnson filed a motion to reduce his bond, which the court denied. The court said at the time that if Johnson posted bond and was released, he should be placed on electronic monitoring and GPS with no movement. On October 24, 2023, after the Pretrial Fairness Act became effective, Johnson filed a motion for pretrial release, asking the court to remove the cash bond requirement that was previously set at $10 million. Counsel for Johnson argued that Johnson has strong family ties, a "minimal criminal history[,]" "no record of missing court appearances or proceedings," and that he "does not pose a real and present threat to the safety of any person or persons in the community." In addition, Johnson's counsel argued that conditions could be put in place so that Johnson would have no contact with his girlfriend, Kaylee, or any contact with his children without DCFS supervision. Counsel also argued that electronic monitoring would suffice to ensure Johnson's appearance in court. In response, the State filed a petition seeking to deny Johnson pretrial release.

¶ 4    According to the State's proffer, in April 2021, Johnson was living with his girlfriend, Kaylee, their 9-week-old infant, J.J., their 18-month-old son J.J., and Kaylee's seven-year-old son, W.M.. On the morning of April 23, 2021, Kaylee fed baby J.J. and put him in his bassinet, which was located in the bedroom she shared with Johnson. When Kaylee left for work around 11 am, baby J.J. was asleep. Johnson stayed at home with W.M., J.J. and the baby.

¶ 5    W.M., who was doing online school, heard baby J.J. crying for most of the day. Around 1 pm, Johnson texted Kaylee and said he woke up to find their 18-month-old son standing over baby J.J.'s bed with a toy phone in his hand and blood around baby J.J.'s mouth. When Kaylee did not

respond, Johnson messaged her again around 1:51 pm, saying he believed she would respond to his texts if he said the children were dead.

¶ 6 When Kaylee arrived home around 4 pm, she observed that baby J.J. seemed irritable and lethargic. She attempted to feed him, but he wouldn't eat. Around 5:30 pm, she took baby J.J. to Johnson's mother's house to determine if she should take him to the hospital. Johnson texted Kaylee and asked her not to go to the hospital, but she took baby J.J. anyways because his condition had worsened. When they arrived at Elmhurst Hospital around 9 pm, baby J.J. was almost immediately transferred to Lutheran General Hospital due to bleeding on his brain. At Lutheran General, baby J.J. was diagnosed with non-accidental traumatic head injury. The documented medical concerns included a subdural hematoma, acute respiratory failure with hypoxia, cerebral herniation, retinal hemorrhage on both eyes, and traumatic brain injury. Medical personnel concluded that the bleeding on baby J.J.'s brain was due to severe trauma. A board-certified physician on child abuse was consulted. She stated that baby J.J.'s injuries were consistent with being shaken and concluded that the injuries could not have been caused by being dropped, falling down the stairs, or by being struck by an object, such as a toy phone. Baby J.J. was pronounced dead on April 29, 2021, and the death was ruled a homicide. The medical examiner's report indicated that baby J.J.'s cause of death was "close head injuries due to abuse," and that the injuries he sustained were caused by "extreme force" and were inconsistent with being hit with a plastic toy. Medical records from baby J.J.'s primary care physician prior to this incident showed that baby J.J. had been healthy and had been developing normally.

¶ 7 After Johnson was released from police custody on April 27, 2021, records from his phone revealed that he made multiple searches regarding "how much force does it take to cause shaken baby syndrome[,]" "child negligence sentencing in Illinois[,]" and "sentencing for involuntary manslaughter in Illinois."

¶ 8    The State indicated that the case took approximately a year to charge because Johnson had been "cohabitating with the pertinent witness in this case," his girlfriend Kaylee. The State noted that in 2019, Johnson had been found guilty of battering Kaylee while she was pregnant with their child. He punched, choked, and dragged her, and was sentenced to supervision. It noted that Johnson had also received supervision as a result of a DUI from 2014. Based on these facts, the State argued that Johnson "poses a real and present threat to safety, specifically of the children in that household as well as to [Kaylee]."

¶ 9    After the State's proffer, Johnson's counsel argued that the evidence against Johnson was circumstantial and advised the court that Johnson and Kaylee had another child after the incident at issue.

¶ 10    The court found that "the proof is evident and the presumption great the defendant has committed a qualifying offense." It also found that Johnson "poses a real and present threat to safety, specifically of the children in that household as well as to the witness identified as, I believe it was Kaylee, by the State in that household." The court said it was "taking into consideration pursuant to the statute the nature and circumstances of the charged offense" and found it was an "extremely violent offense." The court noted that the medical report indicated that the injuries sustained by baby J.J. were the result of "extreme force." It noted that while the evidence was circumstantial, it was nonetheless "compelling considering who had access to that child at the time *** even taking into consideration the timeline identified by the defense in this case." It therefore found there was more than sufficient evidence to detain Johnson.

¶ 11    The court stated that "[b]ased on the level of force involved in this case with that child, I do believe that [Johnson] poses a threat to persons in the community, not only children, but generally persons *** based on his background." The court noted Johnson's "prior violent criminal history" and said the fact that his prior battery case "involved a violent act on another vulnerable

4

person" caused its "concern for the community to be heightened." The court also found that Johnson's prior DUI supervision indicated that "he may indeed potentially be a threat to the safety of the community."

¶ 12    The court found that no condition of pretrial release could mitigate the significant threat to the safety of those persons and the general community or prevent Johnson's willful flight from prosecution. It based its decision on a number of factors, including the nature and circumstances of the charged offense, Johnson's "prior violent criminal history" as well as "the nature and seriousness of the risk of obstructing or attempting to obstruct the criminal justice process that would be posed by the [Johnson's] release." The court noted that the case took more than a year to charge, and that this delay may have been the "result of [Johnson's] interaction with that witness Kaylee." It noted that Johnson and Kaylee had another child together after baby J.J.'s death, which "arguably could have led [Kaylee] to withhold information." The court also found a "potential[] *** risk of nonappearance in court" despite the fact that Johnson made no attempts to flee during the year the case was under investigation because of the seriousness of the charged offense and the fact that Johnson "faces [a] significant penalty if convicted." The court also considered Johnson's character, ties to the community, employment, financial resources, and family support, but ultimately found that "no condition or combination of conditions set forth in pretrial release can mitigate the real and present threat to the safety of any person in the community in this matter based on the specific facts of this case." It therefore ordered Johnson to remain in custody.

¶ 13    On appeal, Johnson argues that the court abused its discretion when it "gave improper weight to the nature and circumstances of the crime itself" and determined that Johnson posed a danger to the community based on his background.

¶ 14    We review for an abuse of discretion whether the trial court properly considered the statutory non-exclusive list of factors in determining whether the defendant poses a real and

5

present threat to the community. See 725 ILCS 5/110-6.1(g) (West 2022); see also *People v. Inman,* 2023 IL App (4th) 230864, ¶ 11. "[I]n considering [the] trial court's decision to deny bail, the reviewing court will not substitute its judgment for that of the trial court merely because it would have balanced the appropriate factors differently." *People v. Vingara*, 2023 IL App (5th) 230698, ¶ 10 (citing *People v. Simmons,* 2019 IL App (1st) 191253, ¶¶ 9, 15). We will find an abuse of discretion only if the trial court's judgment was fanciful, arbitrary or unreasonable, or if no reasonable person would agree with its position. *Vingara,* 2023 IL App (5th) 230698, ¶ 10.

¶ 15    We find that the trial court did not abuse its discretion when it found that Johnson met the dangerousness standard and posed a real and present threat to the safety of the community. Although Johnson argues that the court gave "improper weight to the nature and circumstances of the crime," the record reflects that the trial court based its decision on a number of statutory factors, including Johnson's previous battery of his pregnant girlfriend—"a violent act on another vulnerable person"—and   his prior DUI supervision. See 725 ILCS 5/110-6.1(g) (West 2022) (listing factors the court can consider in making a determination of dangerousness, including the "nature and circumstances of any offense charged[,]" "any evidence of the defendant's prior criminal history indicative of violent, abusive or assaultive behavior[,]" and "[a]ny other factors, including those listed in Section 110-5 of this Article deemed by the court to have a reasonable bearing upon the defendant's propensity or reputation for violent, abusive, or assaultive behavior," including defendant's "past relating to drug or alcohol abuse.") These facts led the court to believe that Johnson "may indeed potentially be a threat to the safety of the community[.]" Accordingly, we find no abuse of discretion.

¶ 16    Next, Johnson argues that the trial court abused its discretion when it found that the State presented clear and convincing evidence showing that no condition or combination of conditions could mitigate the real and present threat to the safety of any person or prevent his willful flight

from prosecution. We will not reverse a trial court's findings that the State presented clear and convincing evidence showing that mandatory conditions of release would fail to protect any person or the community, and/or that defendant had a high likelihood of willful flight to avoid prosecution unless they are against the manifest weight of the evidence. *People v. Swan,* 2023 IL App (5th) 230766, ¶ 11. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). "Under the manifest weight standard, we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and witnesses." *Id.*

¶ 17        Section 5/110-6.1(e) requires the State to prove, by clear and convincing evidence, that "no condition or combination of conditions *** can mitigate (i) the real and present threat to the safety of any person or persons in the community *** or (ii) the defendant's willful flight." 725 ILCS 5/110-6.1(e)(3) (West 2022)). Here, the trial court's decision to deny pretrial release was based in part on the same concerns it articulated when it found that Johnson posed a threat to the safety of the community, including the violent nature of the crime charged, Johnson's prior battery of his pregnant girlfriend, and his prior DUI. In addition, the court relied on "the nature and seriousness of the risk of obstructing or attempting to obstruct the criminal justice process that would be posed by [Johnson's] release." See 725 ILCS 5/110-6.1(e)(2) (West 2022) (noting that the State can prove that a defendant poses a "real and present threat to the safety of any person or persons or the community" based on defendant's conduct, including "the obstruction of justice"). Although Johnson argues that the State offered no evidence to prove that Johnson attempted to obstruct the investigation of the case, the fact that the case took more than a year to charge led the court to conclude that Johnson's cohabitation and interactions with Kaylee during that time and the fact that they were having another child "arguably could have led [Kaylee] to withhold information."

7

The State's proffer also included Johnson's text messages to Kaylee, in which he suggested that their 18-month-old son had caused the injuries to baby J.J. with a toy phone and asked Kaylee not to take baby J.J. to the hospital. Taken together, we find that this evidence supports the trial court's conclusion. The court also concluded that Johnson posed a "potential[] *** risk of nonappearance in court" even though he had made no attempt to flee during the year-long investigation because he "faces [a] significant penalty if convicted."

¶ 18    Johnson argues that the court's finding—that he posed a risk of willful flight—was against the manifest weight of the evidence because Johnson had no history of missing court hearings and had made no attempt to flee during the year-long investigation. Even if the evidence did not support the trial court's findings regarding Johnson's potential flight from prosecution, "it is enough to detain a defendant if the court finds that no conditions of release could mitigate *either* the safety risk or the defendant's willful flight." *People v. Reed*, 2023 IL App (1st) 231834, ¶ 30 (citing 725 ILCS 5/110-6.1(e)(1)-(3) (West 2022)). Because we do not find the trial court abused its discretion in determining that no condition or combination of conditions could sufficiently mitigate the real and present threat that Johnson poses to the community, we need not address this argument.

¶ 19    We affirm the trial court's order granting the State's petition for pretrial detention.

¶ 20    Affirmed.