NOTICE
Decision filed 12/10/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250715-U

NO. 5-25-0715

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 25-CF-189 |
| | ) | |
| KORINTHIAN O. DAVIS, | ) | Honorable |
| | ) | Jerry E. Crisel, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BOIE delivered the judgment of the court.
Justices Barberis and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: This court affirms the trial court's order denying the pretrial release of the defendant, where the State sufficiently established that he committed the charged offense, that he posed a real and present threat to the community, and that no conditions of release could mitigate that threat.

¶ 2    The defendant, Korinthian O. Davis, brings this appeal from the trial court's interlocutory order denying his pretrial release. See Illinois Supreme Court Rule 604(h)(1)(iii) (eff. Apr. 15, 2024) (a defendant may take an appeal from an interlocutory order denying pretrial release). He argues that he is not so dangerous that he cannot be released safely with conditions. This court disagrees and affirms the order denying pretrial release.

1

¶ 3                                    I. BACKGROUND

¶ 4     On August 25, 2025, the State filed an information charging the defendant with
(1) aggravated discharge of a firearm, a Class 1 felony (720 ILCS 5/24-1.2(a)(2), (b) (West 2024)),
and (2) aggravated unlawful use of a weapon, a Class 4 felony (*id.* § 24-1.6(a)(3)(I), (d)(1)). The
first count stemmed from the defendant's allegedly discharging a firearm in the direction of another
person. The second count stemmed from the defendant's allegedly possessing a handgun when he
was under the age of 21 years.

¶ 5     On the same day, the State filed a verified petition to deny the defendant pretrial release
under section 110-6.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/110-6.1
(West 2024)), commonly known as the Pretrial Fairness Act. The petition alleged that the
defendant had committed the offense of aggravated discharge of a firearm, an offense that qualified
him for pretrial detention, and that his pretrial release posed a real and present threat to the
community, based on the specific articulable facts of the case. See *id.* § 110-6.1(a)(6)(A).

¶ 6     On August 26, 2025, the trial court held a hearing on the State's petition to deny pretrial
release. The defendant was present with appointed counsel. The State presented its evidence at the
hearing by way of proffer.

¶ 7     The State proffered that on August 21, 2025, at 10:36 p.m., Mount Vernon police
responded to a report of gunshots in the 700 block of Conger Avenue in Mount Vernon. A large
crowd was outside. Several people stated they had heard gunshots, but nobody claimed to see the
shooter. Police found six brass shell casings in the roadway in the 800 block of Conger Avenue.

¶ 8     The State continued its proffer by stating that the next morning—August 22, 2025—Mount
Vernon police detective Justin Osborn found that a surveillance camera was pointed at the 800
block of Conger Avenue on August 21, 2025. The surveillance video showed "several people"

gathered near the 800 block of Conger Avenue when, at 10:36 p.m., a black man in "dark clothing" exited the residence at 806 Conger Avenue. At about the same moment, a red Chrysler Pacifica arrived, and a black man "with long dreads" exited from the front passenger seat. Then, both the man in dark clothing and the man with long dreadlocks fired six or seven gunshots at the people who were gathered together. "[M]uzzle flashes" were evident on the video. The two shooters ran, and the Pacifica drove westward on Conger Avenue.

¶ 9    The State further proffered that Detective Osborn thought he recognized the shooter who had gotten out of the Pacifica as Eric Nabors, a man with whom Osborn had interacted several hours prior to the shooting. Osborn located a red Pacifica, similar to the one in the video, behind the residence at which Osborn had met Nabors. A warrant for a search of this residence, where the defendant also lived, was obtained and executed on August 22, 2025. A fully-loaded black 9-millimeter pistol was found in Nabors's bedroom, while a black and purple .380 caliber handgun, and live rounds of ammunition, were found in the defendant's bedroom. During the warrant's execution, Nabors, the defendant, and Darin Williams were taken into custody.

¶ 10    The State's proffer included the contents of police interviews with Eric Nabors, the defendant, and Darin Williams, who was the owner of the red Pacifica. During his interview, Nabors stated that on August 21, he and the defendant were together at the scene of the shooting, and they left the scene in the same car. "Nabors stated he did not know how many shots [the defendant] had fired from his gun because things happened so quickly." During a separate interview, the defendant stated that he was at the residence of his cousin, Eric Nabors. Approximately 10 people were outside the residence. Someone knocked on the door. The defendant did not feel any animosity toward any of those people but only wanted to defend himself. The defendant exited the residence and fired his gun. He did not remember the number of shots he

3

fired. The defendant described the gun as a purple and black SCCY .380 caliber handgun. Darin Williams, during his own interview, stated that he drove Nabors to the place where, unbeknownst to Williams, the shooting would occur. During the drive, Nabors was speaking with the defendant by telephone. Upon arrival, Nabors got out of Williams's Pacifica. The defendant "came outside." Shortly afterward, "gunfire erupted." According to Williams, nobody from the group of people "shot back" at Nabors or the defendant. Williams "picked up" Nabors and the defendant as they ran from the scene.

¶ 11    Defense counsel proffered that the defendant was 18 years old and had resided in Jefferson County for 16 years. He currently resided in Mount Vernon with his grandmother, Carmen Nabors. His grandmother had "heart problems," his step-grandfather had cancer, and the defendant was needed at home. The defendant had been working at a fast-food restaurant for three months. He had no criminal history, he had scored a zero on the Virginia Pretrial Risk Assessment Tool, and he had no history of failure to appear in court. Counsel asked that the defendant be released from jail with conditions that included home confinement and electronic monitoring.

¶ 12    In its ruling at the pretrial detention hearing, the trial court found several facts in the defendant's favor—his age, his lack of a criminal history, his family ties, his ties to the community, and his employment. On the other hand, the trial court found that the State had a "very strong" case against the defendant, and the likelihood of conviction was "very high." Aggravated discharge of a firearm was a serious charge that involved reckless conduct. A "very, very important consideration," said the trial court, was the risk of "[g]unplay"—"the absolute reckless indiscriminate use of firearms"—towards innocent persons. The defendant was "just lucky somebody wasn't hit and even luckier that somebody wasn't killed." No condition or combination

4

of conditions could assure the trial court that the defendant would not violate the law or would cooperate with pretrial services. The trial court granted the State's petition to deny pretrial release.

¶ 13    Also on August 26, 2025, the trial court entered a written order for the defendant's detention. The trial court found by clear and convincing evidence that (1) the proof is evident or the presumption great that the defendant had committed an offense listed in section 110-6.1(a) of the Code (725 ILCS 5/110-6.1(a) (West 2024)); (2) the defendant posed a real and present threat to the safety of any person, persons, or the community, based on specific articulable facts of the case; and (3) no condition or combination of conditions could mitigate the threat posed by the defendant. The trial court also made specific findings that the defendant, who was under the age of 21, had acquired a firearm and that he subsequently discharged it toward other people, for reasons unknown. The fact that the motivation for the shooting was unknown meant that "further acts of violence could be forthcoming." The trial court also found that the defendant's pretrial release should be denied for the protection of the public. The trial court ordered the defendant committed to the custody of the county jail.

¶ 14    On August 27, 2025, the defendant filed a motion for relief from the order denying pretrial release. See Ill. S. Ct. R. 604(h)(2) (eff. Apr. 15, 2024). According to the motion, the trial court had failed to "fully consider" the defendant's ties to the community, his willingness to abide by any terms of pretrial release, his "employment opportunities," and his "total lack of criminal history," as well as the fact that "[n]o person was injured" in the incident alleged.

¶ 15    On September 3, 2025, the trial court held a preliminary hearing in this case concurrently with a hearing on the defendant's motion for relief. At the preliminary hearing, Detective Osborn was the sole witness. He testified that as part of his investigation into the Conger Avenue shooting, he contacted the Jefferson County Housing Authority on August 22, 2025, and learned of a

5

surveillance camera pointed toward the scene of the shooting. The video showed a group of people gathered around 800 Conger Avenue on August 21, 2025, at 8:36 p.m. "A short time later," a red Chrysler Pacifica traveled westbound on Conger and stopped near 806 Conger. A middle-aged black man with "long braided hair" got out of the passenger seat of the Pacifica and walked toward the sidewalk. Meanwhile, an "unknown subject" exited 806 Conger. The two seemed to walk toward one another. Then, the two fired guns, "six to seven times," at the group of people. After firing the guns, the two ran westbound on Conger. Detective Osborn then described a police search of a residence and police interviews with Eric Nabors, the defendant, and Darin Williams, all in a manner consistent with the State's proffer of evidence at the August 26, 2025, hearing on the State's petition to deny pretrial release. The trial court found probable cause on both counts.

¶ 16    Turning to the motion for relief, defense counsel requested the pretrial release of the defendant and that he be placed on home confinement and electronic monitoring. Counsel repeated the points he had previously made at the August 26, 2025, pretrial detention hearing.

¶ 17    The trial court largely repeated the findings that it had made during the detention hearing on August 26, 2025. The trial court denied the defendant's motion for relief from the order denying pretrial release. On September 3, 2025, the defendant filed a timely notice of appeal.

¶ 18                                    II. ANALYSIS

¶ 19    In this court, the defendant has opted to file a memorandum in support of his appeal. See Ill. S. Ct. R. 604(h)(7) (eff. Apr. 15, 2024). In the memorandum, the defendant argues that the trial court's pretrial detention order should be reversed due to the State's failure to prove by clear and convincing evidence that the defendant posed a real and present threat to the community that could not be mitigated by conditions set for his release. This court disagrees and affirms the denial of the defendant's pretrial release.

6

¶ 20    Where the parties to a pretrial detention hearing under the Code proceed solely by proffer, with no live witnesses, *de novo* review of the proffered evidence is employed. *People v. Morgan*, 2025 IL 130626, ¶ 54. However, in this case, Detective Osborn testified at the probable cause hearing, which was held concurrently with the hearing on the motion for relief. Therefore, this court will overturn a finding of the trial court only if it is against the manifest weight of the evidence. *Id.* "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *People v. Deleon*, 227 Ill. 2d 322, 332 (2008).

¶ 21    All criminal defendants are presumed eligible for pretrial release. 725 ILCS 5/110-6.1(e) (West 2024). However, the State may seek to overcome that presumption, and to deny a defendant pretrial release, under the dangerousness standard set forth in the Code. See *id.* § 110-6.1(a). When seeking to deny a defendant pretrial release under the dangerousness standard, the State must prove by clear and convincing evidence, that (1) "the proof is evident or the presumption great that the defendant has committed" an offense described in section 110-6.1(a) (*id.* §§ 110-6.1(a), (e)(1)); (2) "the defendant poses a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case" (*id.* §§ 110-6.1(e)(2), (3)) "no condition or combination of conditions *** can mitigate *** the real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case" (*id.* § 110-6.1(e)(3)(i)). "Evidence is clear and convincing if it leaves no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question ***." *Chaudhary v. Department of Human Services*, 2023 IL 127712, ¶ 74. "Decisions regarding release, conditions of release, and detention prior to trial must be individualized, and no single factor or standard may be used exclusively to order detention." 725 ILCS 5/110-6.1(f)(7) (West 2024).

7

¶ 22    In determining whether a defendant poses a real and present threat in the context of pretrial release, a court may consider, *inter alia*: the "nature and circumstances" of any offense charged, including whether the offense involves a weapon (*id.* § 110-6.1(g)(1)); the defendant's "history and characteristics," including any evidence of prior criminal history indicative of violent behavior, or the lack thereof (*id.* § 110-6.1(g)(2)(A)); the age of the defendant (*id.* § 110-6.1(g)(5)); and whether the defendant "is known to possess or have access to any weapon or weapons" (*id.* § 110-6.1(g)(7)). Under section 110-6.1(g)(9) of the Code, a court may also consider those factors listed in section 110-5 of the Code (*id.* § 110-5). These factors include the weight of the evidence against the defendant. *Id.* § 110-5(a)(2).

¶ 23    In this case, there was no dispute that the State presented clear and convincing evidence that the defendant had committed aggravated discharge of a firearm, or that this offense was detainable. See *id.* § 110-6.1(a)(6)(A). The dispute was whether the defendant's pretrial release posed a real and present threat to the community such that no conditions of release could mitigate that threat.

¶ 24    On appeal, the defendant argues that the State's evidence of dangerousness "did not go beyond its description of the offense and was therefore insufficient. While the present charges are serious, being charged with a detainable offense is not enough to order detention." That principle regarding pretrial detention is certainly true. See *People v. Atterberry*, 2023 IL App (4th) 231028, ¶ 18 (many offenses are potentially detainable under the dangerousness standard, but "the fact that a person is charged with a detainable offense is not enough to order detention"). However, the charge itself did not lead to the defendant's pretrial detention. It was the "nature and circumstances" of the charge of aggravated discharge of a weapon (see 725 ILCS 5/110-6.1(g)(1)), plus the defendant's access to firearms (see *id.* § 110-6.1(g)(7)), that were operative.

¶ 25    The State's evidence, which was very strong, showed that both the defendant and an acquaintance opened fire into a group of approximately 10 people who apparently were unarmed, or at least, who did not return fire. The day after the shooting, during an interview with a police detective, the defendant offered no clear reason for his action. There was no apparent need for any self-defense measures at the time of the shooting.

¶ 26    As the trial court stated at the September 3, 2025, hearing on the defendant's motion for relief, the defendant's act was "extremely dangerous and reckless and could have been a real tragedy," and it showed a distinct lack of respect for human life. This court agrees with this observation. On the night of the shooting, the defendant posed a real and present threat to the safety of the community, based on the specific articulable facts of the case. The indiscriminate nature of the defendant's act suggests that if he were released pretrial—on any condition or set of conditions—he would continue to pose such a threat since there is nothing to suggest that he acted in self-defense or in response to any threat. There was also nothing presented to indicate why the defendant even left the security of the residence to begin indiscriminately firing at individuals. As such, home confinement with electronic monitoring would not prevent the defendant from once again leaving a residence and engaging in such dangerous conduct.

¶ 27    Although the defendant's age, lack of a criminal history, and other favorable aspects of his background were considered, the trial court found that particular facts of this case warranted detention given the serious nature of the charge and the potential threat to the safety of the community. As such, we cannot find that the opposite conclusion is clearly evident or that the finding itself is unreasonable, arbitrary, or not based on the evidence presented. Accordingly, we find that the trial court's ruling regarding pretrial detention of the defendant was not against the manifest weight of the evidence.

¶ 28                    III. CONCLUSION

¶ 29    The State proved by clear and convincing evidence that the proof was evident that the defendant had committed aggravated discharge of a firearm, that he posed a real and present threat to the safety of the community, and that no conditions on his release could mitigate that threat. Therefore, the trial court did not err in granting the State's motion to deny the defendant pretrial release and denying the defendant's motion for relief.

¶ 30    Affirmed.