NOTICE
Decision filed 07/03/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240681-U

NO. 5-24-0681

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | No. 23-CM-360 |
| | ) | |
| KHYREE A. YOUNG, | ) | Honorable |
| | ) | Lindsey A. Shelton, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Vaughan and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*: Where the three requirements for a valid warrantless inventory search of a vehicle were met, the circuit court's denial of the defendant's motion to suppress evidence is affirmed.

¶ 2    Following a stipulated bench trial, the defendant, Khyree A. Young, was found guilty of possession of firearm ammunition without possessing a Firearm Owners Identification Card. On appeal, he argues that the circuit court erred in denying his motion to suppress evidence. Based on the following, we affirm the denial of his suppression motion.

¶ 3                                      BACKGROUND

¶ 4    In August 2023, the defendant was charged with possession of firearm ammunition without possessing a Firearm Owners Identification Card (430 ILCS 65/2(a)(2) (West 2022)), a Class A misdemeanor (*id.* § 14(e)). The public defender was appointed to represent the defendant.

1

¶ 5    In December 2023, the defendant filed a motion to suppress. He sought to suppress the ammunition—12 live rounds of 9-millimeter ammunition, in a magazine—that was seized from the front passenger door pocket of his vehicle, following a police traffic stop for speeding. According to the defendant, the search was nonconsensual, warrantless, and otherwise unlawful, and it was conducted under the pretext of an inventory search. The defendant also sought suppression of the statements that he made to police subsequent to the search, as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

¶ 6    On March 21, 2024, the circuit court conducted a hearing on the defendant's motion to suppress. The defendant was not personally present, but his counsel agreed to proceed without the defendant being present. Defense counsel called two witnesses, Joe Oberheim and Lucas Bledsoe.

¶ 7    Joe Oberheim, a nine-year patrol officer with the Decatur Police Department, testified that on July 29, 2023, at approximately 9:15 p.m., he stopped a car for speeding in Decatur. The car's driver was the defendant, who had a valid driver's license and no outstanding warrants for his arrest. The car's registration had expired more than a year earlier. Under the Decatur city code, a car had to be towed and impounded if its registration was expired for more than six months. Therefore, Oberheim was obligated to have the car towed. Because the car was to be towed, Oberheim informed the defendant that the police intended to perform an inventory search. Under the Decatur police procedure, an inventory search involved searching a vehicle for valuable items "[a]nywhere you can have a valuable item, whether it's in the glove box, *** the center console, on the floor, in the backseat, trunk." Valuable items were to be "document[ed] on the tow sheet to make sure *** nothing is taken from [*sic*] the tow company or something is misplaced, anything like that."

¶ 8    Oberheim further testified that another Decatur police officer, Officer Bledsoe, arrived to assist with the stop. It was Bledsoe who began the inventory search. In a door pocket, Oberheim learned, Bledsoe found a magazine with ammunition. After these items were discovered, the officers decided to search the remainder of the car, and they did so, including the car's engine bay. Oberheim identified the tow sheet that he had completed in this case. In the space for listing valuable items, he wrote "fogger, clothing." He did not think that anything else in the car could be worth $50. During Oberheim's testimony, defense counsel showed Oberheim portions of a video, with audio, recorded by Bledsoe's body camera. The video was consistent with Oberheim's testimony. Oberheim confirmed that there was no warrant for the search of the defendant's car, and he neither sought nor received consent for the search.

¶ 9    On cross-examination by the State, Oberheim testified that Bledsoe arrived approximately four minutes after the stop was inititated. Oberheim had already made initial contact with the defendant, requesting his driver's license and proof of insurance and informing him of the reason for the stop. Upon Bledsoe's arrival, Oberheim was sitting in his squad car, using the computer to check on the status of the car's registration. Bledsoe asked whether the car was being towed. Oberheim hesitated, as he read the response to his query about the registration. Based on the response, Oberheim determined that the car needed to be towed and inventoried. As Oberheim completed the necessary paperwork in his squad car, Bledsoe began the inventory search of the defendant's car. Prior to that point, Oberheim had not discussed with Bledsoe any suspicions he had about contraband in the car. In Oberheim's opinion, Bledsoe performed a standard inventory search. After Bledsoe discovered the ammunition, Oberheim and Bledsoe "switched to a search looking for a gun to go with the magazine." Oberheim also testified that "our policy" is to list all items that appear to be worth $50 or more. He listed all such items on the tow sheet.

3

¶ 10    Lucas Bledsoe, a two-year patrol officer with the Decatur police, testified that he assisted Oberheim with the stop of the defendant's car. Once Oberheim determined that the defendant's car would be towed, Bledsoe began an inventory search of the car. He had no reason to expect to find any contraband. Bledsoe discovered the magazine while searching the car's passenger side door. The magazine had not been in plain view.

¶ 11    Admitted into evidence at the suppression hearing was the video, with audio, recorded by Bledsoe's body camera at the scene of the traffic stop. The video was approximately 1 hour and 34 minutes in length, though only a few portions of the video were relevant and need to be described here.

¶ 12    Approximately one minute into the video, Bledsoe arrived at the scene of the stop and parked his squad car at the curb of the roadway, immediately behind Oberheim's squad car. Bledsoe walked up to the front passenger window of Oberheim' squad car. Oberheim, sitting in the driver's seat of his squad car, was looking intently at the monitor of his squad car's computer. After a quick greeting, Bledsoe asked, "You towing him?" Oberheim, still looking intently at the monitor, paused for a moment, and then answered, "Yep." After another moment, Oberheim stated that the vehicle's registration had expired in May 2022. Approximately four minutes into the video, Oberheim got out of his squad car and walked the very short distance to a white, two-door car, which was stopped in front of Oberheim's squad car. For about two minutes, Oberheim stood at the driver's door of that white car. During that time, the driver, who was the defendant, sat alone in the car. He removed his keys from the ignition and apparently handed them to Oberheim. Oberheim walked back to his squad car.

¶ 13    Approximately 15 minutes into the video, Oberheim returned to the driver's side door of the white car. The defendant, at Oberheim's direction, got out of his car and walked with Oberheim

4

to Oberheim's squad car. At that point, Bledsoe began the inventory search of the car. Bledsoe checked the passenger's side and the driver's side of the car's interior, front and back, as well as the trunk. After searching the car for five minutes, Bledsoe walked back to Oberheim's squad car and informed Oberheim that he had found a magazine in the passenger side door. Oberheim immediately handcuffed the defendant. Approximately 25 minutes into the video, as Oberheim directed the defendant into the back seat of his squad car, a tow truck arrived and parked in front of the defendant's white car. Approximately 29 minutes into the video, both Oberheim and Bledsoe were searching the passenger compartment of the defendant's car. Oberheim commented to Bledsoe, "He was doing a lot of [unintelligible]. That's why I knew there was, there's something there." Approximately 46 minutes into the video, and at approximately 51 minutes into the video, an item that Oberheim and Bledsoe agreed to call a "fogger" was seen. The "fogger" bears the brand name "X Shot," and it appeared to be a plastic water gun. Much of the video, from approximately the 28-minute mark to the 53-minute mark, consisted of Oberheim and Bledsoe jointly searching the car.

¶ 14     During argument at the suppression hearing, defense counsel conceded that the traffic stop was lawful at its inception, that the stop was not unlawfully prolonged, and that the vehicle was "lawfully seized." The point of contention, according to defense counsel, was the supposed inventory search, because it was, in fact, an investigatory search. According to defense counsel, the police did not create any documentation that could serve the purpose of an inventory search. Also, the body-camera video established that the officers were suspicious, from the beginning, that the defendant's car held contraband. The "purported inventory search" was nothing but "a pretext for conducting a probable cause search," which they did not have a lawful basis to conduct.

5

Defense counsel added that because the physical evidence should be suppressed, the defendant's statements to the police should also be suppressed.

¶ 15    The State argued that once the officers learned that the car's registration had been expired for more than a year, they knew that the car had to be towed. If it had to be towed, there had to be an inventory search. Moreover, the officers properly completed an inventory of the car. Oberheim may have had "some sort of suspicion of something," but it was never established regarding what that suspicion was based on.

¶ 16    The circuit court denied the motion to suppress evidence. The circuit court made findings regarding the three requirements for a valid inventory search. First, the circuit court found that the car was lawfully impounded for its expired registration, as the defendant had conceded at the suppression hearing. Second, the circuit court found that the search was to protect the defendant's property and to protect the police from claims of lost or damaged property. For this finding, the circuit court relied on the testimony of the two police officers, who testified that the purpose of the inventory search was to document any valuable item—*i.e.*, any item believed to be worth $50 or more, according to Decatur police policy—to make sure that nothing was misplaced or taken by the tow-truck driver. While noting that the police had specified only a "fogger" and "clothing" on the tow sheet, the circuit court stated that the body-camera video showed that the car held "water bottles, random cords, plastic bags, and papers," and the circuit court thought that none of these items had a value that exceeded the $50 threshold. Third, the circuit court found that the inventory search was conducted by the officers in good faith and not as a pretext for an investigatory search. For this finding, the circuit court relied on the actions of Officer Bledsoe. When Bledsoe began the inventory search, the circuit court found he conducted "a very cursory inspection" of the car, and within two minutes of beginning, he found the magazine with bullets in the passenger side

6

door. These were not the actions of an officer engaged in an investigatory search, the circuit court opined. On the video, after the magazine's discovery, Oberheim stated that he knew there was something in the car, but there was no evidence that he told Bledsoe about that suspicion. Once the magazine with bullets was found, the circuit court found there was probable cause to search the car more intensively for other contraband, such as a firearm. The circuit court concluded that the defendant failed to prove that the inventory search was merely a pretext for an investigatory search.

¶ 17     On April 23, 2024, the defendant filed a written waiver of his right to a jury trial. On May 10, 2024, the State and defense counsel presented the circuit court with a written "agreed stipulated facts for bench trial." The written stipulation was just over one page in length and was signed by both the State and defense counsel. The stipulation established the following facts. On July 29, 2023, Decatur police stopped the defendant's car for speeding. The defendant was the sole occupant of the car. During the traffic stop, police searched the vehicle and discovered, in the front passenger door pocket, a magazine with 12 live rounds of 9-millimeter bullets. The defendant did not possess, and had not previously been issued, a Firearm Owners Identification Card. At the scene of the traffic stop, the police gave the defendant *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)). During police questioning, the defendant admitted that he knew, prior to the police search, that the magazine with ammunition was in his car. The parties also agreed that the circuit court should take judicial notice of the facts and evidence presented at the March 21, 2024, hearing on the defendant's motion to suppress evidence.

¶ 18     After receiving the stipulated facts, the circuit court called the case for a stipulated bench trial. The circuit court referred to the "agreed stipulated facts for bench trial" that had been signed by the parties. When the circuit court asked the defendant whether he agreed with those stipulated

7

facts, the defendant indicated that he did. The circuit court found the defendant guilty of possession of firearm ammunition without possessing a Firearm Owners Identification Card. The parties had agreed to a sentence of court supervision for 12 months, with conditions, including completion of a gun-safety course. The circuit court asked the defendant whether he agreed with that sentence, and whether he waived his right to a sentencing hearing, and the defendant answered affirmatively to both questions. The court imposed the agreed-upon sentence.

¶ 19    On May 13, 2024, the defendant filed a motion for a new trial. He argued that his motion to suppress should have been granted, and that the evidence should be excluded from his new trial. On May 21, 2024, the circuit court denied the motion for a new trial. The defendant filed a timely notice of appeal.

¶ 20                                        ANALYSIS

¶ 21    This appeal is from the circuit court's denial of the defendant's motion to suppress evidence. The defendant argues that the inventory search of his car was a pretext for an investigatory search, where the search did not serve the purposes or objectives of an inventory search. We disagree.

¶ 22    When reviewing a circuit court's ruling on a motion to suppress evidence, this court applies a two-part standard of review. *People v. Grant*, 2013 IL 112734, ¶ 12. This court accords "great deference" to the circuit court's factual findings, reversing those findings only if they are against the manifest weight of the evidence. *People v. Gipson*, 203 Ill. 2d 298, 303 (2003). A finding is against the manifest weight of the evidence only if it is unreasonable, arbitrary, or not based on the evidence presented, or if the opposite conclusion is clearly evident. *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). However, "the ultimate legal question of whether suppression is warranted" is reviewed *de novo*. *Gipson*, 203 Ill. 2d at 304.

8

¶ 23 The fourth amendment to the United States Constitution protects individuals from unreasonable searches and seizures. U.S. Const., amend. IV. The fourth amendment applies to the states under the fourteenth amendment. *People v. Timmsen*, 2016 IL 118181, ¶ 9. Our state constitution provides similar protections. See Ill. Const. 1970, art. I, § 6. Warrantless searches are *per se* unreasonable under the fourth amendment, with a few well-delineated exceptions. *Arizona v. Gant*, 556 U.S. 332, 338 (2009); see also *Illinois v. McArthur*, 531 U.S. 326, 330 (2001) (generally, a search is reasonable only if the government first obtains a warrant that is supported by probable cause).

¶ 24 One exception to the warrant requirement is applicable to vehicles that are lawfully impounded. *South Dakota v. Opperman*, 428 U.S. 364, 372 (1976); *People v. Hundley*, 156 Ill. 2d 135, 138 (1993). When a vehicle is lawfully impounded, an inventory search of that vehicle is a judicially created, well-defined exception to the warrant requirement of the fourth amendment. *Colorado v. Bertine*, 479 U.S. 367, 371 (1987); *Gipson*, 203 Ill. 2d at 304. Three requirements must be met for a warrantless inventory search of a vehicle to be valid under the fourth amendment: (1) the original impoundment of the vehicle must be lawful; (2) the purposes or objectives of the inventory search must be (i) to protect the owner's property, (ii) to protect the police from claims of lost, stolen, or vandalized property, and (iii) to protect the police from danger; and (3) the inventory search must be conducted in good faith pursuant to reasonable, standardized police procedures and not as a pretext for an investigatory search. *Hundley*, 156 Ill. 2d at 138; *Gipson*, 203 Ill. 2d at 304 (citing *Opperman*, 428 U.S. at 369). While an inventory search must be conducted pursuant to standardized police procedures, those procedures need not be in writing. *Gipson*, 203 Ill. 2d at 306. "Inventory searches can be upheld solely on an officer's unrebutted testimony that he was following standard procedures." *Id.* at 309.

¶ 25     "When a defendant files a motion to suppress evidence, he bears the burden of proof at a hearing on that motion." *People v. Brooks*, 2017 IL 121413, ¶ 22; 725 ILCS 5/114-12(b) (West 2022) ("the burden of proving that the search and seizure were unlawful shall be on the defendant"). Where the basis for the motion is an allegedly illegal search, a defendant must make a *prima facie* showing that there was a search and that it was illegal. *Brooks*, 2017 IL 121413, ¶ 22. Once the defendant makes a *prima facie* case, the burden shifts to the State to go forward with evidence to counter it. *Id.* "The ultimate burden of proof remains with the defendant, however." *People v. Cregan*, 2014 IL 113600, ¶ 23.

¶ 26     In the instant case, the defendant made a *prima facie* showing that the police had obtained the evidence illegally when he showed that Officers Oberheim and Bledsoe had searched his car without a warrant. See *id.* ¶ 26. That was enough to shift the burden to the State to go forward with evidence to prove that the search was valid because an exception to the warrant requirement applied. See *id.* ¶ 23.

¶ 27     The State then met its burden of going forward. It established, through the testimonies of Oberheim and Bledsoe and through the body-camera video, that the inventory-search exception applied in this case.

¶ 28     First, Oberheim testified in a manner sufficient to meet the first of the three requirements for a valid warrantless inventory search of a vehicle—the requirement that the original impoundment of the vehicle must be lawful. *Hundley*, 156 Ill. 2d at 138. At the suppression hearing, the defendant, through his counsel, conceded that the vehicle was, in fact, "lawfully seized," *i.e.*, lawfully impounded. The circuit court reasonably found that the first requirement had been met.

¶ 29 Second, Oberheim testified regarding the purposes or objectives in performing an inventory search. According to Oberheim, the search's purpose was to document, on a tow sheet, any valuable item—*i.e.*, any item believed to be worth $50 or more, according to Decatur police policy—found in the car in order to "make sure *** nothing is taken from [*sic*] the tow company or something is misplaced, anything like that." That unrebutted testimony was sufficient to meet the second of the three requirements for a valid warrantless inventory search of a vehicle—the requirement that the purpose of the inventory search must be to protect the owner's property and to protect the police from claims of lost, stolen, or vandalized property and to guard the police from danger. *Hundley*, 156 Ill. 2d at 138. The circuit court reasonably found that the second requirement had been met.

¶ 30 The defendant argues on appeal that even though Oberheim's testimony indicated that the police policy on inventory searches was in line with the purposes of an inventory search, "[Oberheim's] implementation of the inventory search emphasized his intent to investigate and, therefore, could not be in line with the policy, meaning that the search was merely a pretext for a probable cause search." According to the defendant, Oberheim's notation of "fogger, clothing" on the tow sheet, with no more precise or descriptive language, was wholly insufficient to protect the defendant's right to his property or to protect the police against claims of theft, vandalism, or negligence, citing *Bertine*, 479 U.S. at 369-70. The defendant concludes, where the purposes of an inventory search are not served, the search is constitutionally invalid.

¶ 31 There is no requirement that a police officer, when performing an inventory search of a vehicle, provide some minimum amount of detail concerning the items in that vehicle. As the State points out in its brief, our supreme court has found that a warrantless inventory search of a vehicle was constitutionally valid even though "[n]o inventory form was introduced into evidence at the

11

suppression hearing." *Hundley*, 156 Ill. 2d at 137. The circuit court found that Oberheim and Bledsoe were complying with police policy by documenting anything they thought was worth $50 or more. While acknowledging that Oberheim wrote only "fogger, clothing" on the tow sheet, the circuit court seemed to think that nothing else in the defendant's car reached the $50 threshold. "[T]he other items I could see in the video were water bottles, random cords, plastic bags, and papers. I don't find—I wouldn't believe that that would be over $50 of value either." In other words, if nothing else could possibly be worth $50, there was nothing more for Oberheim to document on the tow sheet. The circuit court found that the purposes or objectives of an inventory search were fulfilled here. This finding is not against the manifest weight of the evidence.

¶ 32    Third, the manner in which both Oberheim and Bledsoe conducted themselves at the traffic stop, and testified during the suppression hearing, showed that the inventory search was conducted in good faith pursuant to reasonable, standardized police procedures. Oberheim testified that under Decatur police policy, an inventory search of a vehicle involved a search for any valuable item, defined as any item worth $50 or more, "[a]nywhere you can have a valuable item, whether it's in the glove box, *** the center console, on the floor, in the backseat, trunk." Bledsoe, the officer who actually conducted the inventory search, initially searched the car for five minutes. During that initial search, Bledsoe found the ammunition. Oberheim, after viewing the video from Bledsoe's body camera, commented that Bledsoe had performed a standard inventory search. This testimony was unrebutted.

¶ 33    As the circuit court found at the end of the suppression hearing, Bledsoe's search "appears to be a very cursory inspection." Bledsoe "looks in the glove compartment, on top of seats. He empties out a couple of the plastic bags, and within two minutes of starting the inventory search *** he did find the magazine with bullets in the passenger compartment of the side door." The

12

circuit court found good faith and not a pretextual investigatory search. This finding was supported by the evidence and was not against the manifest weight of the evidence.

¶ 34 Also, the defendant, both in the circuit court and in this court, draws attention to that portion of the body-camera video where Oberheim commented to Bledsoe, "I knew there was, there's something there." Oberheim makes that comment approximately 29 minutes into the video, as the two officers were jointly searching the passenger compartment of the defendant's car. The defendant views this comment as proof that Oberheim was determined, from the start of his interaction with the defendant, to perform an investigatory search of the defendant's car. However, this comment was made approximately 12 minutes after Bledsoe's discovery of the magazine with ammunition. Oberheim had not previously shared his suspicion with Bledsoe; therefore, Oberheim's suspicion could not possibly have affected Bledsoe's search. Bledsoe testified that when he began the inventory search, he had no expectation of finding any contraband. The circuit court found that Oberheim's comment did not evince bad faith or an improper investigatory motive on the part of the officers. This finding, too, was not against the manifest weight of the evidence.

¶ 35                                         CONCLUSION

¶ 36 It was, ultimately, the defendant's burden to establish the unlawfulness of the inventory search. The circuit court made findings that supported the lawfulness of the search. These findings were reasonable and based on the evidence, and this court shows great deference to them. As for the circuit court's denial of the defendant's motion to suppress, our *de novo* review concludes that the circuit court's ruling was not erroneous and must be affirmed.

¶ 37 Affirmed.

13