NOTICE
Decision filed 12/04/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250706-U

NO. 5-25-0706

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 25-CF-191 |
| | ) | |
| AMIL GANAWAY, | ) | Honorable |
| | ) | Jerry E. Crisel, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HACKETT delivered the judgment of the court.
Justices McHaney and Bollinger concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's orders granting the State's verified petition to deny pretrial release and denying the defendant's motion for relief are affirmed.

¶ 2    Defendant Amil Ganaway appeals, pursuant to the Pretrial Fairness Act (725 ILCS 5/110-1 *et seq.* (West 2024)), the order of the circuit court of Jefferson County, issued August 28, 2025, granting the State's petition to deny pretrial release, as well as the court's September 3, 2025, order denying his motion for relief and immediate release. Defendant argues that the State failed to present clear and convincing evidence that he posed a threat that no set of pretrial conditions could mitigate. For the following reasons, we affirm.

1

¶ 3                          I. BACKGROUND

¶ 4     On August 25, 2025, defendant was charged with one count of aggravated discharge of a firearm and two counts of aggravated battery with a firearm, all Class X felonies. 720 ILCS 5/24-1.2(a), 12-3(a)(1) (West 2024). The State filed a verified petition to deny pretrial release the same day, alleging that defendant committed a forcible felony, and that he posed a real and present threat to the safety of any person or persons or the community. The trial court held a hearing on the State's petition on August 28, 2025.

¶ 5              A. Hearing on Petition to Deny Pretrial Release

¶ 6     The State presented its evidence by proffer. According to the State, Officer McDonald, of the Mt. Vernon Police Department, would testify about responding to a report of a vehicle collision and shots fired. According to the report, a silver Dodge pickup truck rear-ended a black Mazda van, pushing the van into the middle of the intersection. McDonald would testify that upon his arrival, he spoke with Alexis Neer, the driver of the Mazda van. She was with her two-year-old son, and she denied that anyone else had been in the van at the time of the incident. She also denied possessing a firearm.

¶ 7     Neer told McDonald that she had seen a man she knew to be Darin Carpenter driving a silver Dodge truck, carrying three or four passengers. She further stated that he struck her stationary vehicle and said, "Next time I see you, you're going to get it." Neer said that Carpenter had previously stolen money from her and that she had refused to engage in a physical relationship with him. Neer also mentioned to McDonald that defendant, her son's father, was present at the time of the collision, although she did not say he was in the van with her. Upon searching Neer's van, police found a wallet belonging to defendant.

¶ 8     The State further proffered that there were other witnesses who were identified at the scene who gave differing accounts of what happened, including one who told McDonald that he heard three or four gunshots and then observed a truck speeding away, and another witness who saw a man in a blue polo shirt running from the area after the shooting. McDonald found about 10 shell casings at the scene, as the location of the casings indicated that the shooter was standing outside the van rather than inside the truck. There were no bullet holes in the van.

¶ 9     The State next proffered that Officer Wilson, also of the Mt. Vernon Police Department, would testify that he responded to a 911 call placed by Darin Carpenter, who reported the shooting incident. In responding to the 911 call, Wilson arrived at a residential address in Mt. Vernon. There, he found the silver Dodge truck which had bullet holes indicating that the bullets went through the rear of the vehicle and exited through the front windshield. Wilson spoke with Carpenter, who said he had been driving the truck and sustained a graze wound to his head from the gunfire. Wilson took Carpenter's statement. Carpenter maintained his innocence, stating that he had been shot at by an unknown male. Carpenter denied possessing a firearm.

¶ 10     Carpenter further told Wilson that Neer had been driving the black Mazda van past his house throughout that morning, with an unknown white male hanging out of the passenger window making statements such as, "I know where you live now, bitch." According to Carpenter, the final time that the van drove by, he and two other individuals, Tony Conder and Jeremy Pedigo, got in the truck and pursued the van. Carpenter said that he struck the van because the male passenger exited with a firearm and began shooting at Carpenter's vehicle.

¶ 11     Wilson also spoke with Conder, who had been riding in the front passenger seat of the truck. Conder told him that he saw a man exit the front passenger side of the black Mazda van and begin shooting at them, and that this shooting occurred before the truck made contact with the van.

3

He also said that no one in the truck was armed or returned fire. Pedigo also gave a statement to law enforcement, providing an account similar to Carpenter's and Conder's.

¶ 12 Carpenter also stated that he had previously been in a sexual relationship with Neer, and would come over to her house while her boyfriend, whose name Carpenter believed to be "Amos," was at work. He further said that he received a phone call from Neer's boyfriend two weeks prior. According to Carpenter, the boyfriend threatened him to make him stay away from Neer. Carpenter then deleted Neer from his social media accounts.

¶ 13 Proffered testimony added that both Neer and defendant gave recorded interviews to the Mt. Vernon police. In her interview, Neer changed her statement from what she had told Officer McDonald immediately following the incident. She now admitted that defendant was riding in the front passenger seat of her van at the time, and when he exited the vehicle, she heard gunshots before the collision that pushed her van into the intersection. She further admitted to driving defendant by Carpenter's house earlier that morning.

¶ 14 Neer also told police that she had recently filed for an order of protection against defendant because he had held a gun to her head and threatened her. She knew that defendant had owned a pistol, which he reported stolen after she served him with the order of protection. One of the interviewing officers also spoke with Neer's mother, who told him that she had spoken with defendant on the phone after the incident, and he admitted to her that he had shot at Carpenter and that he had hidden the gun and fled to Centralia.

¶ 15 When police interviewed defendant, he told them where he had hidden the gun, which the police later recovered. After being advised per *Miranda* (*Miranda v. Arizona*, 384 U.S. 436 (1966)), defendant told police that Carpenter owed him $330, money which defendant had loaned to him. Carpenter was ignoring all of his repayment requests and had blocked him on various

4

money transfer apps. On the day of the incident, defendant said he was traveling with his girlfriend and son when he spotted a man he knew to be Darin Carpenter. Defendant and his girlfriend followed Carpenter to a residence, and then circled the block twice. On the first pass, defendant claimed that he told individuals standing outside the residence to tell Carpenter that he needed his money. On the second pass, defendant said that Carpenter exited the residence, got in his truck, and pursued their vehicle.

¶ 16 According to defendant's statement, the truck rammed into the rear of their van while stopped at a stop sign. Defendant then got out of the van and pointed his gun at Carpenter to deter him. Carpenter's truck then allegedly swerved towards defendant before striking the van and fleeing. Defendant admitted to discharging his firearm multiple times at the back of Carpenter's fleeing truck, stating that he did so in self-defense. When confronted with other witnesses' statements indicating that he was heard threatening Carpenter, defendant denied making any such comments. Defendant also admitted to knowing that his FOID was suspended due to an active order of protection against him.

¶ 17 Defendant admitted to fleeing the scene on foot after the shooting and contacting a friend who owned the residence where defendant hid his firearm. The friend transported him to Centralia. Defendant further admitted to turning off his phone's geolocation services and wiping his hands with alcohol. He claimed that he intended to return to the police station, but he was unable to secure transportation for several hours.

¶ 18 After making its factual proffer, the State argued that defendant had been charged with three Class X felonies, and the underlying conduct involved shooting at and injuring people. Additionally, defendant's alleged aggravated discharge of a firearm took place within 1,000 feet of a school. The State expected to present testimony from Darin Carpenter and Tony Conder that

5

they both sustained graze wounds to the head, which the State argued showed just how close defendant was to the vehicle when the shooting occurred, as well as how close he came to inflicting serious harm. Regarding defendant's assertion that he was acting in self-defense, the State argued that he admitted to shooting at Carpenter as the latter was fleeing in his vehicle and that even by defendant's own admission, any danger that may have existed had passed by the time he started shooting.

¶ 19    The State added that the evidence from police testimony and the damaged truck showed that the bullets passed through the back of the truck and out the front. While there was no eyewitness testimony as to the shooting itself, there were witness accounts of individuals running from the scene. Carpenter and Conder both stated that the shooting happened before the collision. Neer originally told Officer McDonald a story different than what she later relayed at the police department, when she admitted that the shooting took place before the collision.

¶ 20    The State further alleged that defendant fleeing the scene, hiding the firearm, and wiping his hands clean after the shooting were all "indicative of a guilty mind." The State argued that this was "not a who-done-it case," but rather a "was he justified" case. Further, with the version of events that defendant himself described, there was a very high likelihood that self-defense would not be a viable defense. Given the nature of the facts, the State maintained that there were no less-restrictive means available to ensure defendant's compliance with pretrial conditions. The suspension of his FOID status had not deterred him from possessing a firearm, moreover, he dishonestly reported it stolen.

¶ 21    Defense counsel argued that defendant was 22 years old and had family ties to Jefferson County, which included a two-year-old son. He was employed, and had no criminal convictions, not even a traffic conviction. He had never been on probation and had no record of failing to appear

6

in court. According to the defense, defendant acted in self-defense because the truck was following the van. Defendant also turned himself in and gave a voluntary statement to the police. Defense counsel further argued that 1 of the 10 shell casings found at the scene came from a different gun, which suggested that defendant did act in self-defense.

¶ 22    The trial court asked the State about the one different shell casing, and the State contended that the crime scene investigator would testify that this one casing had a stamp which he could not read. Therefore, it was inconclusive at best that there was any other firearm involved in the incident. Additionally, the State argued that no one, including defendant, had indicated that anyone else had a firearm. The State added that the self-defense argument was further contradicted by the fact that defendant had been harassing Carpenter at his house before the incident.

¶ 23    The trial court found the following factors in defendant's favor: his youth, his lack of prior criminal history, and the fact that he turned himself in. The court also noted that he had some connection to the community, "but not much," so the court found that this was "not too helpful" for him. However, the court further explained that the charges against him were "very serious," and defendant's actions indicated that he was aware of that seriousness and was conscious of his guilt. These actions included fleeing the scene and trying to clean the gunshot residue off his hands. Furthermore, he knew his FOID card was suspended, but still possessed a gun; he admitted to firing the gun, and he admitted to fleeing on foot. While the court acknowledged that he did "some things right" in making the admissions he made, the court also considered that he did so "way after the fact."

¶ 24    The court noted that the charges were very serious Class X felonies involving two separate acts of shooting two different victims. The charges carried mandatory prison time. The court stated that this raised an issue of possible flight risk if defendant were released. But what bothered the

7

court the most was "just the outrageous gunplay." The court described it as "miraculous[ ]" that neither victim was killed or seriously injured, and opined that defendant "evidently[ ] didn't really care" and was "just blazing away in a neighborhood and next to a school and next to a church." The court concluded that there was a very strong likelihood that the State would succeed in this case, and that the self-defense argument carried little weight.

¶ 25    Lastly, the court recognized that there was no evidence of defendant using drugs or alcohol. However, the court found it all the more concerning that defendant behaved in the manner that he did upon losing his temper, especially when he was old enough to realize that the behavior alleged was not warranted given the circumstances. The court found that defendant constituted a clear and present danger to a man who "allegedly was having some relations" with defendant's girlfriend, and "this is not normal behavior." Because of this dangerous behavior, the court did not believe that releasing defendant on any conditions would be appropriate. Thus, the trial court granted the State's petition to deny pretrial release.

¶ 26                                B. Motion for Relief

¶ 27    The defense filed a motion for relief on August 29, 2025, arguing that the State had not met its burden by clear and convincing evidence that no conditions could mitigate any threat defendant posed. The defense contended that the trial court failed to fully consider defendant's ties to the community, his willingness to abide by any terms of pretrial release, his employment opportunities, his lack of criminal history, and his surrender to the authorities.

¶ 28    The trial court held a probable cause hearing and a hearing on defendant's motion for relief on September 3, 2025. At the hearing, the State presented live testimony from Detective Robert Kane, who investigated the scene of the incident and the truck at Carpenter's residence. Kane testified that Carpenter and Conder received graze wounds to the head, and that Carpenter went to

8

be treated at the hospital. He confirmed that police found defendant's wallet in Neer's van and that Condor and Pedigo said they saw a man exit her vehicle and point a firearm at them, and that after the collision, the man kept shooting as they fled in the truck. Witnesses reported hearing a vehicle crash and gunshots; one person saw a white male running northbound from the scene. A retired state trooper who was in the area came to assist the responding officers. He also witnessed the white male running northbound.

¶ 29    Kane further testified that a detective spoke with Carpenter, who said that the father of Neer's child had been sending him threatening messages to stay away from Neer, with whom he was involved in a sexual relationship. Carpenter also owed this man money. Carpenter described Neer and the man driving past his house while the man shouted threatening taunts, including, "I know where you are now, next time you're gonna get it." Security camera footage from nearby residences showed Neer's van driving by, with a man in the front passenger seat.

¶ 30    Kane later received a synopsis of defendant's statement, from the detectives who took the statement. They told Kane that defendant said he felt threatened when he exited Neer's van and discharged his firearm at Carpenter's truck. Defendant said he continued shooting at the vehicle as it drove away. Kane testified that there were 10 shell casings recovered from the scene, 9 of which had matching stamps and 1 that was difficult to make out. He also inspected Carpenter's truck and located several rounds that had entered through the rear of the vehicle. Two rounds were in line with where occupants were sitting in the vehicle.

¶ 31    Kane also confirmed that there was a school "just short of 500 feet" from the intersection where the shooting took place. Later, Kane received a phone call from the retired state trooper who had assisted police at the scene. He told Kane that a church near the intersection had been struck. Kane went to investigate, and observed a round stuck in the metal framing of a window of the

9

church's nursery. Kane also learned that Neer had filed for an order of protection against defendant because he had pointed his pistol at her, and that defendant had reported this pistol stolen. Kane testified about defendant's admissions regarding the shooting and hiding the gun, as per the State's previous factual proffer. Police recovered the gun from the location given by defendant.

¶ 32    Defense counsel argued that defendant was 22 years old and had lived in Jefferson County for approximately 18 months. He lived there with his girlfriend and their son, and so he had family ties in the community. He was employed at the time of his arrest. He had no criminal history, and was not on probation or any kind of release. Further, the defense highlighted that he had no record of failing to appear for court proceedings and scored a zero on the pretrial risk assessment tool, due to his lack of criminal history. The defense asked that he be released on home confinement with electronic monitoring, and alleged that the trial court failed to fully consider all of these factors, as well as the fact that he turned himself in.

¶ 33    The State emphasized that defendant admitted to discharging a firearm in the direction of a vehicle occupied by three individuals, two of whom sustained injuries as a result. He also admitted to shooting at the vehicle as it was leaving the scene, which the State argued contradicted his self-defense claim. The State added that defendant discharged his firearm in the direction of a church and in the vicinity of a school. The State noted that Neer had filed for an order of protection against defendant because of his conduct with a firearm. Defendant had hidden the gun, despite his later decision to turn himself in and reveal the location of the weapon. The State concluded that the totality of the circumstances supported the denial of pretrial release.

¶ 34    The trial court stated that it had heard nothing to change its mind. The court again weighed defendant's lack of criminal history and his employment status in his favor, and again noted that he had some community ties, although the court noted that those ties included Neer, who was

10

involved in the incident. However, the court opined that defendant's alleged conduct "was totally beyond the pale of civilized behavior," and it was a miracle that neither victim was more seriously injured or killed. The court repeated that the State's case was very strong, and thus there was a high likelihood of prison time for the Class X charges, which increased the flight risk if defendant were released. Lastly, the court noted that the incident occurred on a Sunday morning, and people were in the church that was hit. The court found this to indicate defendant's "complete disregard for humanity," and thus there were no conditions that would assure the court that defendant could abide by a pretrial release order.

¶ 35    The court thus denied defendant's motion for relief on September 3, 2025. Defendant filed a notice of appeal pursuant to Illinois Supreme Court Rule 604(h), which conferred jurisdiction on this court. See Ill. S. Ct. R. 604(h)(3) (eff. Apr. 15, 2024).

¶ 36                                II. ANALYSIS

¶ 37    Pretrial release is governed by article 110 of the Code of Criminal Procedure of 1963 (Code), as amended by Public Act 101-652 (eff. Jan. 1, 2023), sometimes referred to as the Pretrial Fairness Act (Act). Under article 110 of the Code, a defendant's pretrial release may only be denied in certain limited situations. See 725 ILCS 5/110-2(a), 110-6.1 (West 2024).

¶ 38    If the State files a petition requesting denial of pretrial release,

> "the State has the burden to prove by clear and convincing evidence that the proof is evident or the presumption great that a defendant has committed a qualifying offense, that the defendant's pretrial release poses a real and present threat to the safety of any person or the community or a flight risk, and that less restrictive conditions would not avoid a real and present threat to the safety of any person or the community and/or prevent the defendant's willful flight from prosecution." *People v. Vingara*, 2023 IL App (5th) 230698, ¶ 7.

725 ILCS 5/110-6.1(e), (f) (West 2024).

Our supreme court has instructed that "[e]vidence is clear and convincing if it leaves no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question." *Chaudhary v.*

11

*Department of Human Services*, 2023 IL 127712, ¶ 74; see also *People v. Stock*, 2023 IL App (1st) 231753, ¶ 12 ("Clear and convincing evidence is that quantum of proof that leaves no reasonable doubt in the mind of the fact finder about the truth of the proposition in question." (Internal quotation marks omitted.)).

¶ 39     The trial court may order a defendant detained pending trial if the defendant is charged with a qualifying offense and the court concludes the defendant "poses a real and present threat to the safety of any person" or the community. 725 ILCS 5/110-6.1(a) (West 2024). The statute provides a nonexclusive list of "[f]actors to be considered in making a determination of dangerousness" that the trial court may consider in assessing whether the defendant poses such a threat. *Id.* § 110-6.1(g). These include the nature and circumstances of any offense charged, the defendant's history and characteristics, the identity of any person whose safety the defendant is believed to threaten, and "[a]ny other factors, including those listed in Section 110-5 of this Article deemed by the court to have a reasonable bearing upon the defendant's propensity or reputation for violent, abusive, or assaultive behavior, or lack of such behavior." *Id.* § 110-6.1(g)(9).

¶ 40     If the trial court finds the State proved a threat to the safety of any person or the community, the court must determine which pretrial release conditions, "if any, will reasonably ensure the appearance of a defendant as required or the safety of any other person or the community and the likelihood of compliance by the defendant with all the conditions of pretrial release." *Id.* § 110-5(a). In making this determination, the court must consider (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; (4) the nature and seriousness of the real and present threat to the safety of any person or the community, based on the specific articulable facts of the case, that

would be posed by the defendant's release; and (5) the nature and seriousness of the risk of obstructing or attempting to obstruct the criminal justice process. *Id.*

¶ 41    Our standard of review of pretrial release determinations is twofold. Where the parties to a pretrial detention hearing proceed solely by proffer or submission of documentary evidence, this court stands in the same position as the trial court and may conduct its own independent review of the proffered evidence, thus reviewing the record *de novo*. *People v. Morgan*, 2025 IL 130626, ¶ 54. However, where the trial court is asked to consider the testimony of live witnesses, and make factual findings, such as the State's burden of presenting clear and convincing evidence that conditions of pretrial release would not protect any person or the community, the defendant has a high likelihood of willful flight to avoid prosecution, or the defendant failed to comply with previously ordered conditions of pretrial release, our standard of review is the manifest weight of the evidence. *Id.* "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *People v. Deleon*, 227 Ill. 2d 322, 332 (2008).

¶ 42    Regarding the standard of review, we initially note that while the trial court heard evidence by proffer at the pretrial detention hearing, the court heard Detective Kane provide the same factual allegations through his live testimony at the hearing on defendant's motion for relief. Accordingly, we will apply the manifest weight of the evidence standard of review. However, even applying *de novo* review to the trial court's factual findings based on the proffered evidence, our conclusion remains the same.

¶ 43    On appeal, defendant argues that the State failed to present clear and convincing evidence that he posed a threat that no pretrial conditions could mitigate, where he had no prior criminal history and scored a zero on the pretrial risk assessment. Defendant adds that there was no evidence

13

presented that he had ever violated any electronic monitoring order or would not abide by the terms of home confinement. He further argues that the proper question is whether any pretrial condition or conditions could mitigate risk, not eliminate it entirely. Defendant asserts that there was no evidentiary basis for finding that no conditions could mitigate any threat he may pose to the community or the individuals involved. We disagree, and find that the trial court's decision was not against the manifest weight of the evidence.

¶ 44   The record shows that the trial court thoroughly reviewed the evidence and considered all of the statutory factors in determining that defendant posed "a real and present threat to the safety of any person or persons or the community." 725 ILCS 5/110-6.1(g) (West 2024). The court found that the nature and circumstances of the offenses charged were quite serious. Defendant was charged with three Class X felonies involving the use of a firearm and physical harm to two victims. See *id.* §§ 110-5(a)(1); 110-6.1(g)(1) (in considering the nature of the offense, court may consider whether it was a crime of violence and whether it involved a weapon). In addition to risking serious harm to the individuals he injured, defendant repeatedly fired his gun in the vicinity of a school and a church, the latter of which was occupied at the time. The trial court found that defendant's behavior evidenced a "complete disregard for humanity." Furthermore, the trial court stated that the charges against defendant were nonprobationable, which the court determined increased defendant's flight risk.

¶ 45   The trial court found that the weight of the evidence against defendant was very strong. See *id.* § 110-5(a)(2). Moreover, the court stated that defendant's self-defense argument was contradicted by the evidence, which included: police testimony that Carpenter's truck had damage from bullets entering through the rear; police statements from Carpenter, Conder, and Neer that the shooting took place before the truck hit Neer's van; and defendant's own admission that he

14

shot at the truck as it was driving away. Defendant and Neer both admitted to driving past Carpenter's house immediately prior to the incident as defendant shouted at him, and defendant further admitted to the shooting.

¶ 46    We thus agree with the trial court that the proof is evident and the presumption great that defendant committed the offense charged. Moreover, as the State argues on appeal, defendant's ability to bring a viable justification claim at trial, while relevant, is not dispositive at a pretrial release hearing. See *People v. Smith*, 2024 IL App (2d) 240168, ¶ 21.

¶ 47    As to the history and characteristics of the defendant, the trial court acknowledged that his age, employment status, and lack of criminal history weighed in his favor. See 725 ILCS 5/110-5(a)(3), 110-6.1(g)(2), (g)(8) (West 2024) (court may consider defendant's prior criminal history, record concerning court appearances, probation and/or parole status, or lack thereof, as well as defendant's employment, family ties, and connection to the community). While the defense argued he had community ties to Jefferson County because he lived there with his girlfriend and son, the trial court found that this was not a strong factor in his favor, noting its concern over Neer's own involvement in the incident. Furthermore, the trial court found that there was evidence that defendant would not abide by pretrial conditions despite a lack of criminal history. This included pointing a pistol at Neer, leading to her filing an order of protection, followed by defendant falsely reporting that his pistol was stolen and his continued possession of the pistol despite the suspension of his FOID status.

¶ 48    This finding also addressed the factor of defendant's risk of obstructing the criminal justice process. Although the trial court acknowledged that defendant eventually turned himself in, the court also noted that he initially fled the scene of the crime, hid the weapon, and tried to wash the

gun residue off his hands. See *id.* § 110-5(a)(5) (court may consider "nature and seriousness of the risk of [defendant's] obstructing or attempting to obstruct the criminal justice process").

¶ 49 Lastly, regarding the specific threat defendant posed to the safety of any person or the community, the trial court found this factor particularly significant, given its aforementioned findings that defendant had threatened and specifically targeted Carpenter, that two individuals sustained head wounds, that defendant discharged a firearm in the vicinity of a school and a church, and that defendant reacted to his dispute with Carpenter with disproportionate and reckless violence. See *id.* § 110-5(a)(4); see also *id.* § 110-6.1(g)(4) (court may consider statements made by defendant and their surrounding circumstances).

¶ 50 Thus, there was sufficient evidence supporting the State's argument that the proof is evident or the presumption great that defendant committed a qualifying offense and posed a danger to the community, as well as to Carpenter specifically. We therefore conclude that the trial court properly granted the State's petition and denied defendant's subsequent motion.

¶ 51                                        III. CONCLUSION

¶ 52 Based on the foregoing reasons, we affirm the orders of the circuit court of Jefferson County granting the State's verified petition to deny pretrial release and denying the defendant's motion for relief and immediate release.


¶ 53 Affirmed.

16